**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN BETTUA, GIUSEPPINA P. DONIA, DERRAL HOWARD, DENISE MILLER, CHARLES NAPOLI, VIC PFEFER, CHRISTINA RAMER, JEFFREY A. AND SANDRA K. ROBINSON, Individually And On Behalf Of All Others Similarly Situated, Plaintiffs, v. SEARS, ROEBUCK AND CO., Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 08 C 1832 |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE CLASS ALLEGATIONS FROM THE CONSOLIDATED CLASS ACTION COMPLAINT**

Table of Contents

Page

Table of Authorities .................................................................................... iii

INTRODUCTION ...................................................................................... 1

STATEMENT OF FACTS ........................................................................ 3

    A.    Plaintiffs' Allegations ................................................................. 3

    B.    The Kenmore Access and Kenmore Horizon Washers' Service
        Histories ...................................................................................... 8

    C.    Procedural History of This Lawsuit ........................................... 10

ARGUMENT .............................................................................................. 10

I.    PLAINTIFFS' PROPOSED CLASSES ARE FATALLY OVER-INCLUSIVE
    AND UNASCERTAINABLE .............................................................. 11

    A.    The Vast Majority of HE Washer Owners Do Not Have a Claim for
        Economic Loss Based on an Alleged Defect That Has Never
        Manifested.................................................................................. 13

    B.    The Overwhelming Majority of HE Washer Owners Do Not Have Any
        Claim for Cost-of-Repair Damages or Other Out-of-Pocket Damages
        Because They Have Not Incurred Any Such Repair Costs or Damages ... 15

II.    PLAINTIFFS' MMWA CLASS ALLEGATIONS SHOULD BE STRICKEN
    FOR FAILURE TO NAME 100 PLAINTIFFS IN THE COMPLAINT .............. 16

III.    PLAINTIFFS' ALLEGATIONS AND THE HE WASHERS' SERVICE
    HISTORY SHOW THAT PLAINTIFFS' CLAIMS ARE ATYPICAL ............... 16

IV.    INDIVIDUAL QUESTIONS OF FACT AND LAW DOMINATE
    PLAINTIFFS' CLAIMS FOR MONEY DAMAGES, MAKING A CLASS
    ACTION INFERIOR AND UNMANAGEABLE................................................. 18

    A.    Individual Questions of Law Dominate Plaintiffs' Putative Class
        Claims ......................................................................................... 19

        1.    The laws regarding Plaintiffs' MMWA, consumer fraud,
                warranty, and unjust enrichment claims vary from state to state... 19

2.      For Plaintiffs' MMWA claims, Illinois conflicts-of-law rules require the application of the laws of the class members' states of purchase ...................................................................... 22

3.      Individual issues of law dominate Plaintiffs' putative class claims ........................................................................ 23

B.    Individual Issues of Fact Dominate All of Plaintiffs' Putative Class Claims ............................................................................ 24

1.      The elements required to prove violations of the consumer protection statutes will necessitate individualized fact determinations ................................................................ 25

2.      The elements of Plaintiffs' express-warranty and implied-warranty claims will necessitate individual inquiries ................... 29

3.      Plaintiffs' unjust enrichment claims require individual inquiries.. 31

C.    The Predominance of Individual Questions of Fact and Law Renders Plaintiffs' Proposed Class Action Unmanageable and Inferior ................ 32

V.    PLAINTIFFS' PROPOSED INJUNCTIVE-RELIEF CLASSES DO NOT SATISFY THE REQUIREMENTS OF RULE 23(b)(2) ..................................... 33

A.    Rule 23(b)(2) Certification Is Not Appropriate Where, as Here, Plaintiffs Seek Predominantly Monetary Relief ....................................... 33

B.    Rule 23(b)(2) Certification Is Not Appropriate Where, as Here, Individual Questions of Fact Predominate.................................................. 34

C.    Rule 23(b)(2) Certification Is Not Appropriate Where, as Here, Individual Questions of Law Predominate ................................................. 35

CONCLUSION............................................................................................ 35

Table of Authorities

<u>Cases</u>                                                                                          <u>Page</u>

*Am. Suzuki Motor Corp. v. Super. Ct.*,
44 Cal. Rptr. 2d 526 (Cal. Ct. App. 1995) ........................................................ 14n

*Anabaldi v. Sunbeam*,
651 F. Supp. 1343 (N.D. Ill. 1987) .................................................................. 22n

*Barbara's Sales, Inc. v. Intel Corp.*,
857 N.E.2d 717 (Ill. App. Ct. 2006) ................................................................ 22

*Barbarin v. Gen. Motors Corp.*,
No. 84-0888, 1993 WL 765821 (D.D.C. Sept. 22, 1993) ................................... 14

*Bd. of Educ. of Twp. High Sch. v. Climatemp, Inc.*,
Nos. 79 C 3144 & 79 C 4898, 1981 WL 2033 (N.D. Ill. Feb. 20, 1981) ........... 3n,11

*Bethards v. Bard Access Sys., Inc.*,
No. 94 C 1522, 1995 WL 75356 (N.D. Ill. Feb. 22, 1995) .................................. 18

*Blaz v. Belfer*,
368 F.3d 501 (5th Cir. 2004) ......................................................................... 12

*Briehl v. Gen. Motors Corp.*,
172 F.3d 623 (8th Cir. 1999) ......................................................................... 13,14

*Carlson v. Gen. Motors Corp.*,
883 F.2d 287 (4th Cir. 1989) ......................................................................... 13n

*Caudle v. Am. Arbitration Ass'n*,
230 F.3d 920 (7th Cir. 2000) ......................................................................... 12

*Chin v. Chrysler Corp.*,
182 F.R.D. 448 (D.N.J. 1998) ......................................................................... 29

*Clark v. Experian Info., Inc.*,
233 F.R.D. 508 (N.D. Ill. 2005) ..................................................................... 25n

*Clark v. Experian Info. Solutions, Inc.*,
256 Fed. Appx. 818 (7th Cir. 2007) ................................................................. 28n

*Clay v. Am. Tobacco Co.*,
188 F.R.D. 483 (S.D. Ill. 1999) ..................................................................... *passim*

*Cole v. Gen. Motors Corp.*,
484 F.3d 717 (5th Cir. 2007) ........................................................................ 21

*Commander Props. Corp. v. Beech Aircraft Corp.*,
164 F.R.D. 529 (D. Kan. 1995).................................................................... 22

*Compaq Computer Corp. v. Lapray*,
135 S.W.3d 657 (Tex. 2004)......................................................................... 15n

*Cook County Coll. Teachers Union, Local 1600 v. Byrd*,
456 F.2d 882 (7th Cir. 1972) ...................................................................... 3n,10

*Dennis v. Whirlpool Corp.*,
Case No. 9:06-cv-80784-KLR (S.D. Fla. Mar. 12, 2007) .......................... 2n

*Doll v. Chi. Title Ins. Co.*,
246 F.R.D. 683 (D. Kan. 2007)..................................................................... 22

*Drooger v. Carlisle Tire & Wheel Co.*,
No. 1:05-CV-73, 2006 WL 1008719 (W.D. Mich. Apr. 18, 2006) .................. 23-24

*Everett v. TK-Taito, L.L.C.*,
178 S.W.3d 844 (Tex. App. 2005).................................................................. 14n

*Feinstein v. Firestone Tire & Rubber Co.*,
535 F. Supp. 595 (S.D.N.Y. 1982)................................................................. 30n

*Fisher v. Bristol-Myers Squibb Co.*,
181 F.R.D. 365 (N.D. Ill. 1998)..................................................................... 20n,33n

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)....................................................................................... 10

*Green v. McNeil Nutritionals, LLC*,
No. 2004-0379-CA, 2005 WL 3388158 (Fla. Cir. Ct., Nov. 16, 2005)............ 32n

*Hamilton v. O'Connor Chevrolet, Inc.*,
No. 02 C 1897, 2006 WL 1697171 (N.D. Ill. June 12, 2006) ......................... 26n,28

*Hubbard v. Gen. Motors Corp.*,
No. 95 Civ. 4362, 1996 WL 274018 (S.D.N.Y. May 22, 1996)....................... 13n

*In re Aiello*,
231 B.R. 693 (N.D. Ill. 1999) ........................................................................ 12

*In re Allstate Ins. Co.*,
400 F.3d 505 (7th Cir. 2005) ......................................................................... 34

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ....................................................... 11,23

*In re Baycol Prods. Litig.*,
218 F.R.D. 197 (D. Minn. 2003)..................................................... 32n

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*,
288 F.3d 1012 (7th Cir. 2002) ....................................................... *passim*

*In re Canon Cameras Litig.*,
237 F.R.D. 357 (S.D.N.Y. 2006) ................................................... *passim*

*In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*,
241 F.R.D. 305 (S.D. Ill. 2007) ..................................................... 20n-21n

*In re Gen. Motors Corp. Engine Interchange Litig.*,
594 F.2d 1106 (7th Cir. 1979) ....................................................... 16

*In re Gen. Motors Type III Door Latch Litig.*,
Nos. 98 C 5836, MDL 1266, 2001 WL 103434 (N.D. Ill. Jan. 31, 2001) ........................ 13n,15

*In re Jackson Nat'l Life Ins. Co. Premium Litig.*,
183 F.R.D. 217 (W.D. Mich. 1998)................................................ 32n

*In re Paxil Litig.*,
212 F.R.D. 539 (C.D. Cal. 2003) ................................................... 35

*In re Rezulin Prods. Liab. Litig.*,
210 F.R.D. 61 (S.D.N.Y. 2002) ..................................................... 35

*In re Rhone-Poulenc Rorer Inc.*,
51 F.3d 1293 (7th Cir. 1995) ......................................................... 33

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
Nos. 05 C 4742 & 05 C 2623, 2006 WL 3754823 (N.D. Ill. Dec. 18, 2006) ................... 19,20n, 22-23

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
No. 05 C 4742, 05 C 2623, 2007 WL 4287511 (N.D. Ill. Dec. 4, 2007)......................... 24n,32n, 33

*In re St. Jude Med., Inc. Silzone Heart Valve Prods. Liab. Litig.*,
522 F.3d 836 (8th Cir. 2008) ......................................................... 25n

*Jarman v. United Indus. Corp.*,
98 F. Supp. 2d 757 (S.D. Miss. 2000)............................................ 13

*Krieger v. Gast,*
197 F.R.D. 310 (W.D. Mich. 2000) .......................................................... 32n

*Kubany v. Sch. Bd.,*
149 F.R.D. 664 (M.D. Fla. 1993) .............................................................. 12,17

*Lilly v. Ford Motor Co.,*
No. 00 C 7372, 2002 WL 507126 (N.D. Ill. Apr. 3, 2002) .......................... 20n,33n

*Lumpkin v. E.I. Du Pont de Nemours & Co.,*
161 F.R.D. 480 (M.D. Ga. 1995) ............................................................... 3n,11,17

*Martin v. Am. Med. Sys., Inc.,*
No. IP 94-2067-C-H/G, 1995 WL 680630 (S.D. Ind. Oct. 25, 1995) ............. 18

*McDaniel v. Qwest Commc'ns Corp.,*
No. 05 C 1008, 2006 WL 1476110 (N.D. Ill. May 23, 2006) ........................ 19

*McElhaney v. Eli Lilly & Co.,*
93 F.R.D. 875 (D.S.D. 1982) ..................................................................... 11

*McLaughlin v. Am. Tobacco Co.,*
522 F.3d 215 (2d Cir. 2008) ...................................................................... 28n

*Miller v. Motorola, Inc.,*
76 F.R.D. 516 (N.D. Ill. 1977) .................................................................... 13

*Osborne v. Subaru of Am., Inc.,*
243 Cal. Rptr. 815 (Cal. Ct. App. 1988) .................................................... 30

*Oshana v. Coca-Cola Bottling Co.,*
225 F.R.D. 575 (N.D. Ill. 2005) ................................................................. *passim*

*Oshana v. Coca-Cola, Inc.,*
472 F.3d 506 (7th Cir. 2007) ..................................................................... 18

*Osuna v. Wal-Mart Stores, Inc.,*
No. C20014319, 2004 WL 3255430 (Ariz. Super. Ct. Dec. 23, 2004) ........... 32n

*Perkins v. DaimlerChrysler Corp.,*
890 A.2d 997 (N.J. Super Ct. App. Div. 2006) ............................................ 14n

*Pfizer, Inc. v. Farsian,*
682 So. 2d 405 (Ala. 1996) ....................................................................... 15

*Pratt v. Panasonic Consumer Elecs. Co.,*
2006 WL 1933660 (N.J. Super. Ct. July 12, 2006) ....................................... 14n

*Richards v. Delta Air Lines, Inc.*,
453 F.3d 525 (D.C. Cir. 2006) ............................................................ 34

*Simer v. Rios*,
661 F.2d 655 (7th Cir. 1981) ............................................................ 11,19,25

*So. States Police Benev. Ass'n, Inc. v. First Choice Armor & Equip., Inc.*,
241 F.R.D. 85 (D. Mass. 2007) ............................................................ 22

*Solomon v. Bell Atlantic Corp.*,
9 A.D.3d 49 (N.Y. App. Div. 2004) ............................................................ 25n

*Spence v. Glock, Ges.m.b.H.*,
227 F.3d 308 (5th Cir. 2000) ............................................................ 19

*Sun Oil Co. v. Wortman*,
486 U.S. 717 (1988) ............................................................ 19

*Thompson v. Am. Tobacco Co.*,
189 F.R.D. 544 (D. Minn. 1999) ............................................................ 35

*Thornton v. State Farm Mut. Auto Ins. Co.*,
No. 1:06-cv-00018, 2006 WL 3359482 (N.D. Ohio Nov. 17, 2006) ................ 3n,11

*Tietsworth v. Harley-Davidson, Inc.*,
677 N.W.2d 233 (Wis. 2004) ............................................................ 14

*Vantassell-Matin v. Nelson*,
741 F. Supp. 698 (N.D. Ill. 1990) ............................................................ 22

*Voelker v. Porsche Cars N. Am., Inc.*,
353 F.3d 516 (7th Cir. 2003) ............................................................ 20n

*Walsh v. Ford Motor Co.*,
807 F.2d 1000 (D.C. Cir. 1986) ............................................................ 20

*Walsh v. Ford Motor Co.*,
130 F.R.D. 260 (D.D.C. 1990) ............................................................ 21,29

*Weaver v. Chrysler Corp.*,
172 F.R.D. 96 (S.D.N.Y. 1997) ............................................................ 13,14n

*Williams v. Ford Motor Co.*,
192 F.R.D. 580 (N.D. Ill. 2000) ............................................................ 16,18, 28n

*Yost v. Gen. Motors Corp.*,
651 F. Supp. 656 (D.N.J. 1986) ............................................................ 14n

<u>Statutes and Regulations</u>

15 U.S.C. § 2301 ........................................................................................................... 1

15 U.S.C. § 2310 ........................................................................................................... 3,10,16

Fed. R. Civ. P. 12 ......................................................................................................... 2n,3,35

Fed. R. Civ. P. 23 ......................................................................................................... *passim*

<u>Other Authorities</u>

H.R. Rep. No. 93-1107 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7702 ........................... 16

1 Joseph M. McLaughlin, *McLaughlin on Class Actions*, § 5:53 (2006) ......................... 11-12

## <u>INTRODUCTION</u>

Plaintiffs John Bettua, Giuseppina Donia, Derral Howard, Denise Miller, Charles Napoli, Vic Pfefer, Christina Ramer, and Jeffrey and Sandra Robinson ("Plaintiffs") have filed a Consolidated Class Action Complaint ("Complaint") against Defendant Sears, Roebuck and Co. ("Sears") purportedly on behalf of all purchasers of Sears' Kenmore®-brand HE2 and HE2t front-loading washing machines[1] and Kenmore Elite®-brand HE3, HE3t, HE4t, and HE5t front-loading washing machines[2] (collectively, "HE washers" or "HE washing machines").[3]  (Compl. ¶ 2.)  Plaintiffs allege that Sears failed to disclose that HE washers contain a design defect that allegedly causes the machines to "accumulate mold and mildew," "produce a moldy odor that permeates consumers' homes," and "produce a mold or mildew odor on clothes washed" in the machines.  (*Id.* ¶¶ 2, 24.)  Plaintiffs purportedly filed the Complaint on behalf of two types of putative classes:  (i) a nationwide class consisting of all purchasers of HE washers (*id.* ¶ 84); and (ii) seven statewide subclasses consisting of all purchasers of HE washers who reside in the named plaintiffs' home states (*id.* ¶ 85).  According to Plaintiffs, all HE washer purchasers share claims for monetary damages and equitable relief for violations of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq*., and the consumer protection statutes of Arizona, Colorado, Florida, Ohio, Oklahoma, Pennsylvania, and Wisconsin, as well as claims for breach of express and implied warranties and unjust enrichment.  (Compl. ¶ 4.)  Thus, Plaintiffs claim, if the Court were to rule for them on the merits, it also would have to rule for all HE washer buyers on the merits, making individual trials unnecessary and a class trial efficient and appropriate.

The fatal flaw in Plaintiffs' class allegations is that they lack any foundation in fact, and such demonstrably false allegations cannot properly provide a basis for allowing Plaintiffs to impose on Sears and the Court the substantial costs involved in class-certification discovery and proceedings.  The putative class members bought different models of HE washers from different

---

[1] Sears refers to the Kenmore® HE2 and HE2t washers herein as "Kenmore Horizon washers" because they are manufactured by Whirlpool Corporation ("Whirlpool") on Whirlpool's "Horizon" engineering platform.  (Aff. of Steven Namnick ¶ 2.b & n.2, attached hereto as Exhibit 1.)

[2] Sears refers to the Kenmore Elite® HE3, HE3t, HE4t, and HE5t washers herein as "Kenmore Access washers" because they are manufactured by Whirlpool on Whirlpool's "Access" engineering platform.  (Ex. 1 ¶ 2.a & n.1.)

[3] The HE washers are manufactured by Whirlpool exclusively for sale to Sears and for resale by Sears to Sears' customers.  (*See* Aff. of Anthony Hardaway ¶ 3, attached hereto as Exhibit 2.)

model years and with different features, made their purchase decisions for different reasons after receiving different representations (if any) from Sears or third parties, treated their machines differently and used different detergents in different amounts, experienced different alleged problems (if any), made different efforts at remediation (if any), had different warranties and extended service plans, and received different remedies (if any).  In fact, the vast majority of HE washer owners have not experienced any mold, mildew, or odor problem, and they therefore have no claim:

- Approximately 98.16% of all Kenmore Access washer owners in the United States who are known to Sears have never experienced any problem that potentially could have been related to mold or mildew growth in their Access washer, including owners who now have owned their washers for more than six years.[4]  (Ex. 1 ¶¶ 2.a, 7, & Table 3.)

- Approximately 99.50% of all Kenmore Horizon washer owners in the United States who are known to Sears have never experienced any problem that potentially could have been related to mold or mildew growth in their Horizon washer, including owners who now have owned their washers for more than three years.[5]  (*Id.* ¶¶ 2.b, 7, & Table 4.)

The miniscule percentages of Kenmore Access owners and Kenmore Horizon owners (1.84% and .50%, respectively) who have experienced any problem even <u>potentially</u> related to mold or mildew growth in their washer fatally undermine any inference that HE washers suffer from a common defect that has resulted in a common, class-wide injury.  Buyers whose machines have not experienced any mold or mildew problem plainly do not and cannot share Plaintiffs' purported claims for consumer fraud, breach of warranty, or unjust enrichment.

Absent allegations supporting a <u>reasonable</u> inference of a design defect causing class-wide injury, Plaintiffs have failed to allege a cohesive, identifiable class, and also have failed to allege that their claims are typical of the putative class members.  Plaintiffs' failure to make a *prima facie* showing that they might be able to satisfy Rule 23(a) precludes certification of any

---

[4] It is appropriate for the Court to consider facts outside the Complaint in support of a motion to strike class allegations pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").  *See, e.g.*, *Dennis v. Whirlpool Corp.*, Case No. 9:06-cv-80784-KLR, at 5 n.1 (S.D. Fla. Mar. 12, 2007) ("Plaintiffs asked the Court to strike Defendant's motion [to strike class allegations] on the grounds that Defendant's exhibits are improper under Rule 12(b)(6).  Defendant's exhibits are proper, however, as defendant introduced them in support of its motion to strike class allegations."), attached hereto as Exhibit 11.

[5] Sears has sold Kenmore Access washers since 2001 and has sold Kenmore Horizon washers since 2005.  (Ex. 1 ¶ 6 & Tables 1-2.)

injunctive-relief or money-damages class.  Further, individual questions of fact and law necessarily will predominate over any issue that might be common to the proposed class or proposed subclasses, precluding certification under Rule 23(b)(3).  It will be necessary to litigate on a class member-by-class member basis highly individualized questions of fact relating to the following liability elements:  existence of a product defect; breach of warranty; pre-suit notice of breach; what statements or disclosures, if any, each purchaser received before buying the machine; proximate cause; reliance; and actual damage or loss.  Still further, Plaintiffs' proposed classes are unsuitable for class certification under Rule 23(b)(2) because an injunctive-relief class is never appropriate where, as here, the primary relief sought is pecuniary and individual issues of fact and law predominate.  Finally, Plaintiffs fail to meet MMWA's requirement that there be 100 named plaintiffs to bring a warranty class action.  15 U.S.C. § 2310(d)(3)(C).

Accordingly, pursuant to Federal Rules of Civil Procedure 12(f) ("Rule 12(f)"), 23(c)(1), and 23(d)(1)(D), the Court should strike all class allegations from the Complaint because Plaintiffs have pled no viable theory of class recovery and, as a matter of law, cannot satisfy Rule 23's requirements for class certification.[6]  To do otherwise would allow Plaintiffs to impose on Sears hundreds of thousands of dollars in discovery expenses to defeat, inevitably, Plaintiffs' frivolous class claims.

## STATEMENT OF FACTS

### A.     Plaintiffs' Allegations

Plaintiffs have filed a Complaint against Sears purportedly on behalf of all buyers of Sears' Kenmore Horizon washers and Kenmore Access washers.  (Compl. ¶¶ 1-2; Ex. 1 ¶ 2.)

---

[6] *See* Fed. R. Civ. P. 23(c)(1)(A) ("At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action."); Fed. R. Civ. P. 23(d)(1)(D) (empowering a court to "require that the pleadings be amended to eliminate allegations about representation of absent persons. . . ."); *Cook County Coll. Teachers Union, Local 1600 v. Byrd*, 456 F.2d 882, 885-86 (7th Cir. 1972) (affirming the district court's order striking class allegations for failure to satisfy Rule 23(a), because the plaintiff "was obliged in its complaint to allege facts bringing the action within the appropriate requirements of the Rule"); *Bd. of Educ. of Twp. High Sch. v. Climatemp, Inc.*, Nos. 79 C 3144 & 79 C 4898, 1981 WL 2033, at *2 (N.D. Ill. Feb. 20, 1981) (finding that motion to strike was procedurally appropriate, reflecting "the court's inherent power to prune pleadings in order to expedite the administration of justice and to prevent abuse of its process"); *Thornton v. State Farm Mut. Auto Ins. Co.*, No. 1:06-cv-00018, 2006 WL 3359482, at *1 (N.D. Ohio Nov. 17, 2006) (granting motion to strike class allegations under Rule 23(c) and (d)); *Lumpkin v. E.I. Du Pont de Nemours & Co.*, 161 F.R.D. 480, 481-82 (M.D. Ga. 1995) (striking class allegations and stating that "awaiting further discovery will only cause needless delay and expense").

Plaintiffs allege that Sears was aware of the "fact," but failed to disclose to consumers, that all HE washers "contain a serious design defect" that cause the machines to "accumulate mold and mildew" and to "produce a moldy odor" that permeates consumers' homes and clothes washed in the machines.  (Compl. ¶ 2.)  With respect to the nature of the alleged design defect, Plaintiffs allege "on information and belief" only that the stainless steel wash drum and the door seal "play a role" in the accumulation of mold and mildew in the machines.  (*Id*. ¶ 25.)

With respect to Sears' purported express warranties and statements to HE washer purchasers, Plaintiffs allege in pertinent part:

> In recognition of the anticipated useful life of the Machines, Sears expressly warranted that the Washing Machines were reliable, that they were free from defects, and that they were of merchantable quality and workmanship.  Sears specifically represented that the Washing Machines were "designed and manufactured for years of dependable operation" and, in recognition of the anticipated useful life of the Machines, expressly warranted the stainless steel drum of the Washing Machines for its lifetime.  Specifically, Sears provided a "limited lifetime warranty on the stainless steel drum" stating that, "for the lifetime of the washer from the date of purchase," Sears would replace the "Stainless Steel drum due to defective material or workmanship." . . . Under this warranty, Sears was obligated, *inter alia*, to repair the water drainage defect at no charge.  Defendant has these same obligations with respect to Plaintiffs and all Class members, but has failed to satisfy these obligations.  In conjunction with each sale, the Defendant marketed, advertised and warranted that the defective Washing Machines were fit for the ordinary purpose for which such goods were used and were free from defects, or, at a minimum, would not accumulate mold, mildew, and emit associated odors.

(*Id*. ¶ 22.)  These allegations, however, are false and misleading.  First, only the Kenmore Access washers, and not the Kenmore Horizon washers, include a lifetime limited warranty on the stainless steel wash drum.[7]  (*Compare, e.g.*, HE2 Owner's Manual at 3, July 2005, attached hereto as Ex. 3, *with* HE3 Owner's Manual at 3, May 2006, attached hereto as Ex. 4.)  Second, the Kenmore Access washer warranty states that the customer will be charged for labor "[a]fter the first year," so Plaintiffs Bettua, Donia, Howard, Pfefer, Ramer, and the Robinsons cannot credibly claim that Sears had an obligation to repair their Kenmore Access washers "at no charge."  (*Compare* Ex. 4 at 3, HE3 Owner's Manual at 3, Sept. 2002, attached hereto as Ex. 5,

---

[7] Consequently, Plaintiffs Miller and Napoli did not receive any limited lifetime warranty for the stainless steel drum in their HE2 (Kenmore Horizon) washer.  (*See* Compl. ¶¶ 9-10.)

HE3 Owner's Manual at 3, Oct. 2003, attached hereto as Ex. 6, HE3t Owner's Manual at 3, Oct. 2003, attached hereto as Ex. 7, HE4t Owner's Manual at 3, May 2006, attached hereto as Ex. 8, *and* HE3 Owner's Manual at 3, July 2005, attached hereto as Ex. 9, *with* Compl. ¶¶ 6-8, 11-13 (Plaintiffs bought various models of HE3, HE3t, or HE4t (Kenmore Access) washers during the period September 2003 through July 2006).) Third, in alleging that Sears represented the HE washers as "designed and manufactured for years of dependable operation" (Compl. ¶ 22), Plaintiffs have quoted selectively from Sears' written warranties to mislead the Court. The complete statement, which is part of Sears' marketing of its service contracts, <u>not</u> the machines themselves, is: "Your Kenmore® product is designed, manufactured and tested to provide years of dependable operation. <u>But like all products, it may require service from time to time</u>. That's when having a Mater Protection Agreement can save you money and aggravation." (Ex. 4 at 2; *see also* Ex. 3 at 2; Ex. 5 at 2; Ex. 6 at 2; Ex. 7 at 2; Ex. 8 at 2; Ex. 9 at 2.)

Plaintiffs allege that they and the putative class members have suffered damages in that they (i) "overpaid for the Machines because the value of the Machines was diminished at the time that they were sold to consumers" (Compl. ¶ 30); and (ii) have incurred out-of-pocket repair costs and other expenses, including the cost of replacing clothing washed in the machines (*id.* ¶¶ 29, 31, 32, 134, 174). With respect to their own HE washers, Plaintiffs allege specifically as follows:

- Plaintiff Bettua, a Florida resident, alleges that he bought a Kenmore Elite® "HE3.5"[8] washer in June 2006 (*id.* ¶¶ 6, 47) and began to experience "mold and mildew odor problems (both escaping from the Machine and affecting clothing and other items washed in the Machine) in or about June 2007" (*id.* ¶ 48). He alleges that a Sears service technician offered to replace the "rubber seal" in his machine for $400.00, but Plaintiff Bettua declined. (*Id.* ¶ 49.) He further alleges that he contacted "Sears' Corporate Office," but Sears "refused to fix the problem" and only offered him "cleaning tips." (*Id.* ¶ 50.) He alleges that the problems have continued despite his "independent efforts" to resolve the problem by cleaning the machine with bleach. (*Id.* ¶ 51.)

---

[8] Sears does not sell an HE washer under the "3.5" model number, so Sears assumes that Plaintiff Bettua intended to allege that he bought an HE3 washer.

- Plaintiff Giuseppina Donia, a resident of Ohio, alleges that she bought a Kenmore Elite[®] HE3 washer in September 2003 (Compl. ¶ 52) and began to experience problems "one and a half to two years" after buying her machine (*id.* ¶ 53). She alleges that she "raised the mold/mildew issue with a Sears repair person in or about the Summer of 2005," but the service technician "was unable to offer any effective solution," and her "independent efforts" to eliminate the mold and mildew have been unsuccessful. (*Id.* ¶ 54.)

- Plaintiff Derral Howard, an Oklahoma resident, alleges that he bought a Kenmore Elite[®] HE3 washer in July 2005 (Compl. ¶ 55) and began to experience problems in July 2007 (*id.* ¶ 56). He alleges that he discovered "brown mold" inside the "corrugated drain hose," which he replaced, temporarily alleviating the problem. (*Id.* ¶ 57.) In February 2008, he e-mailed Sears concerning the mold-mildew problem, and received an e-mail response that included cleaning and maintenance instructions. (*Id.* ¶ 58.) He alleges that the problems have continued despite his "independent efforts" to eliminate the mold and mildew. (*Id.* ¶ 59.)

- Plaintiff Denise Miller, a Wisconsin resident, alleges that she bought a Kenmore[®] HE2 washer in February 2006 (Compl. ¶ 60) and began to experience problems in July 2006 (*id.* ¶ 61). She alleges that a Sears service technician came to her home on October 8, 2007, but was "unable to offer any effective solution." (*Id.* ¶ 62.) Plaintiff Miller's "efforts to resolve the problem by running bleach" through her washer have been unsuccessful. (*Id.*)

- Plaintiff Charles Napoli, an Arizona resident, alleges that he bought a Kenmore[®] HE2 washer in October 2006 (Compl. ¶ 63) and began to experience problems "within six months" (*id.* ¶ 64). He alleges that, in May 2007, a Sears repairman came to his home and sold Mr. Napoli a "Sears cleaning product," but that the "mold and mildew problem continued." (*Id.* ¶ 65.) "As a result of the mold and mildew problem, Napoli purchased an extended warranty from Sears on or about May 29, 2007." (*Id.*) He alleges that a second Sears repairman came to his home on September 14, 2007, but "was unable to offer any effective solution." (*Id.* ¶ 66.) The Sears repairman allegedly removed a "tube underneath the machine," which emitted a "horrible moldy smell." (*Id.*) The charge for the service visit of $132.00 was covered under the service contract Plaintiff Napoli bought in May 2007. (*Id.*) Plaintiff Napoli also alleges that he has observed mold and

mildew "underneath the front of the stainless steel drum and on the inside of the rubber gasket within the machine" (*id.* ¶ 67), and that he independently has tried a number of cleaning solutions, none of which have been successful (*id.* ¶ 68).

- Plaintiff Vic Pfefer, a Colorado resident, alleges that he brought a Kenmore Elite® HE3 in "Spring of 2004" from The Great Indoors (a store owned by Sears) (Compl. ¶ 69), and he bought it because "it had a high revolutions per minute speed, which would result in a faster drying time and less moisture on towels and articles of clothing" (*id.* ¶ 70). He began experiencing mildew odor problems in December 2006. (*Id.* ¶ 71.) In January 2008, he alleges that he e-mailed the "Customer Care Department at Sears" concerning the mold-mildew problem, and received an e-mail response that included cleaning and maintenance instructions. (*Id.* ¶ 72.) He alleges that he performed the cleaning process pursuant to Sears' instructions, but "the mold and mildew continues to develop" in his machine. (*Id.* ¶ 73.) Plaintiff Pfefer also alleges that he "has been forced to replace towels and other articles of clothing at a cost of approximately $200.00," and has "experienced increased energy costs, due to the multiple empty loads with bleach that he has been directed to run by Sears." (*Id.* ¶ 74.)

- Plaintiff Christina Ramer, a Pennsylvania resident, alleges that she bought a Kenmore Elite® HE3t washer in February 2004 (Compl. ¶ 75) and began to experience problems "approximately six months after purchasing the Washing Machine" (*id*. ¶ 76). She alleges that she "raised the mold/mildew issue with Sears repair person on several occasions," but they were unable to offer an effective solution, and on one occasion the technician told her that mold and mildew is "an issue with the Washing Machines and that Ramer would 'have to deal with it.'" (*Id.* ¶ 77.) She alleges that her "independent efforts to resolve the problem by sanitizing the Machine have been unsuccessful." (*Id.*) She also alleges that she bought a "mold test kit" that showed that mold and mildew were "prevalent" in the machine. (*Id.*) "On or about September 24, 2007, in response to Ramer's complaints concerning the mold and mildew and after reviewing the results from Ramer's mold test kit, Sears replaced Ramer's Washing Machine with a top-loader machine that was less than half the cost of Ramer's" HE3t washer. (*Id.* ¶ 78.)

- Plaintiffs Jeffrey and Sandra Robinson, residents of Wisconsin, allege they bought a Kenmore Elite® HE4t washer in July 2006 (Compl. ¶ 79) and experienced problems with

mold-mildew and odor within four months (*id.* ¶ 81).  The Robinsons allege that "Sears and its representatives . . . represented the Washing Machine as the 'best washing machine in the industry.'"  (*Id.* ¶ 80.)  The Robinsons further allege that, in the Fall of 2006, a Sears service technician advised them to sanitize the machine by following the instructions in the owner's manual, but those efforts proved unsuccessful.  (*Id.* ¶ 82.)  The Robinsons allege that in October 2007, another Sears technician came to their home and "was candid about the problem that plagues the Washing Machines and stated that there is no permanent fix for the mold and mildew problem in the Washing Machines."  (*Id.* ¶ 83.)

On behalf of two types of putative classes, (i) a nationwide class consisting of all persons residing in the United States who bought an HE washer (Compl. ¶ 84) and (ii) "in the alternative," seven statewide "Sub-Classes" consisting of all buyers of HE washers who reside in Arizona, Colorado, Florida, Ohio, Oklahoma, Pennsylvania, and Wisconsin (*id.* ¶ 85).  Plaintiffs seek monetary and equitable relief for (1) violations of the MMWA (*id.* ¶¶ 93-110); (2) violation of the consumer protection statutes of Arizona, Colorado, Florida, Ohio, Oklahoma, Pennsylvania, and Wisconsin (*id.* ¶¶ 111-74); (3) breach of express warranty under the laws of Arizona, Colorado, Florida, Ohio, Oklahoma, Pennsylvania, and Wisconsin (*id.* ¶¶ 175-244); (4) breach of implied warranty of merchantability under the laws of Arizona, Colorado, Florida, Ohio, Oklahoma, Pennsylvania, and Wisconsin (*id.* ¶¶ 245-335); and (5) unjust enrichment under the laws of Arizona, Colorado, Florida, Ohio, Oklahoma, Pennsylvania, and Wisconsin (*id.* ¶¶ 336-70).  Plaintiffs do not limit their proposed nationwide class and statewide subclasses to specific washer models or to a specific sales period, nor do they limit the class definitions to persons who bought their washers directly from Sears (as opposed to second- and third-hand buyers), nor do Plaintiffs limit their classes to persons who actually have experienced any manifestation of the alleged defect.  (*Id.* ¶¶ 84-85.)

**B.    The Kenmore Access and Kenmore Horizon Washers' Service Histories**

Although Plaintiffs' putative class claims are based on an alleged "design defect" in all HE washers (Compl. ¶ 2), and, in particular, in the washers' stainless steel drums (*id.* ¶ 25), the overwhelming majority of HE washer owners have never experienced the problems experienced

by Plaintiffs.[9]  Using service data collected and maintained by Sears in the ordinary course of Sears' business operations, Sears conducted a search of its in-warranty and out-of-warranty service records to identify all owners of Kenmore Access washers manufactured and sold since 2001 who reported a problem that <u>potentially</u> was related to mold or mildew growth or related odors, similar to those allegedly experienced by Plaintiffs.  (Ex. 1 ¶ 7.)  Because Sears maintains service data for the entire life of the washer, Sears' data are particularly instructive as to the nature and extent of the mold-mildew problems allegedly experienced by Plaintiffs.  These data show that only approximately 1.84% of the 1,653,744 Kenmore Access washer owners known to Sears reportedly had experienced any problem that potentially could have been related to mold or mildew growth in their Kenmore Access washer.  (*Id.* at ¶ 7 & Table 3.)  Sears' data include owners who have owned their washers for more than six years.

Using the same data sources and methodology, Sears conducted an additional analysis to identify all owners of Kenmore Horizon washers manufactured and sold since 2005 who reported a problem that <u>potentially</u> was related to mold or mildew growth or related odors, similar to the problems allegedly experienced by Plaintiffs.  (*Id.* ¶ 7.)  These data show that only approximately .50% of 894,348 Kenmore Horizon washer owners known to Sears reportedly had experienced any problem that potentially could have been related to mold or mildew growth in their Kenmore Horizon washer.  (*Id.* ¶ 7 & Table 4.)  Sears' data include owners who have owned their washers for more than three years.

Sears' records thus confirm that the alleged problems about which Plaintiffs complain are extraordinarily rare, not common, much less uniform across the putative class.

---

[9] It is literally impossible to design and manufacture mass-produced appliances so that no percentage of the appliances sold will require repair during the life of the product.  (Ex. 2 ¶ 22.)  For example, in the February 2008 issue of *Consumer Reports*, Consumers Union published the results of its repair-history survey of approximately 113,000 consumers for various brands of front- and top-loading washing machines sold between 2003 and 2007.  (*Consumer Reports*, Feb. 2008, at 47, attached as Ex. 10.)  The reported repair rates for front-loading washers range between approximately 9% and approximately 17%, with Kenmore® brand having the second lowest repair rate at 10%.  (*Id.*; *see also* Ex. 2 ¶ 23 & Ex. E at 342; *Consumer Reports*, May 2007, at 13 (reporting that Kenmore® washers are one of the "reliable" brands of front-loading washers and have the second-lowest repair rate among front-loading washing machines sold between 2002 and 2006), attached hereto as Ex. 11.)

C.    **Procedural History of This Lawsuit**

Plaintiffs originally filed this putative class action on behalf of Plaintiff Napoli only, and separately filed nearly identical putative class actions on behalf of Plaintiff Donia in the United States District Court for the Northern District of Ohio (*Donia v. Sears Holding Corp.*, Civil Action No. 1:07CV2627 ("*Donia*")), and on behalf of Plaintiffs Miller and Robinson in the United States District Court for the Eastern District of Wisconsin (*Robinson v. Sears Holding Corp.*, Civil Action No. 2:08-C-00217 ("*Robinson*")).  By agreement of the parties, the *Robinson* and *Donia* actions were voluntarily dismissed, and the claims of the named plaintiffs in those actions have been combined with the claims of Plaintiff Napoli in this action.  In addition, Plaintiffs have added claims on behalf of four new named plaintiffs who purport to represent HE washer owners in four new states.  In all, the Complaint now includes nine named plaintiffs and 30 claims against Sears.

## ARGUMENT

When it is practicable to do so early in a putative class action, a court should determine that an action cannot properly be certified for class treatment.  *See* Fed. R. Civ. P. 23(c)(1)(A). The complaint must allege facts that, if true, would satisfy Rule 23(a)'s prerequisites and at least one of Rule 23(b)'s certification requirements.  *See Byrd*, 456 F.2d at 885 ("[The plaintiff] was obliged in its complaint to allege facts bringing the action within the appropriate requirements of the Rule.").  "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

It is clear from the face of the Complaint that Plaintiffs have not alleged a viable theory of class recovery, and there is neither need nor justification to wait for the parties to conduct class discovery and litigate class certification.  Plaintiffs have failed to allege any well-pled facts—rather than demonstrably false or conclusory allegations—that would satisfy Rule 23's requirements.  Plaintiffs also do not satisfy MMWA's requirement that any federal warranty class action include a minimum of 100 named plaintiffs.  *See* 15 U.S.C. § 2310(d)(3)(C).  Where, as here, the allegations in the complaint demonstrate that the action is not suitable for class treatment, it is appropriate to strike the class allegations to prevent unnecessary and wasteful class discovery.  *See, e.g.*, *Byrd*, 456 F.2d at 885-86 (affirming the district court's order striking

class allegations for failure to satisfy Rule 23(a)); *Thornton*, 2006 WL 3359482, at *4 ("Although this Rule 'does not mandate precipitate action[,]' it is only necessary to delay a decision where 'the existing record is inadequate for resolving the relevant issues.'" (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1086 (6th Cir. 1996))); *Climatemp*, 1981 WL 2033, at *2 (finding that motion to strike was procedurally appropriate, reflecting "the court's inherent power to prune pleadings in order to expedite the administration of justice and to prevent abuse of its process"); *Lumpkin*, 161 F.R.D. at 481-82 (striking class allegations and stating that "awaiting further discovery will only cause needless delay and expense"). If the Court were to allow Plaintiffs to conduct class discovery before striking their class allegations, the effect would be to impose massive, wasteful litigation expenses on Sears, interrupt and intrude on normal business operations, and postpone the inevitable conclusion that the putative class and subclasses do not meet Rule 23's prerequisites for certification.

## I.    PLAINTIFFS' PROPOSED CLASSES ARE FATALLY OVER-INCLUSIVE AND UNASCERTAINABLE

Courts have recognized that an implied prerequisite to class certification is that the proposed class be susceptible to precise definition so that a court can ascertain whether a particular individual is a member of the class. *See Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999). "The definition of a class should not be so broad so as to include individuals who are without standing to maintain the action on their own behalf." *Id.*; *see also McElhaney v. Eli Lilly & Co.*, 93 F.R.D. 875, 878 (D.S.D. 1982) ("Each class member must have standing to bring the suit in his own right."). A proposed class that includes class members who have not suffered harm cannot be certified. *See, e.g.*, *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005) (denying certification of proposed class of all fountain Diet Coke purchasers in Illinois in part because the proposed class would necessarily include millions of persons who could not show damage); *cf. Simer v. Rios*, 661 F.2d 655, 670 (7th Cir. 1981) ("[I]dentifying the class insures that those actually harmed by defendants' wrongful conduct will be the recipients of the relief eventually provided."). As one commentator has observed:

> The majority view is that there is no legally cognizable injury in a product defect case, regardless of whether the claim is for fraud, violation of consumer protection statutes, breach of warranty, or any other theory, unless the alleged defect has manifested itself in the product used by the claimant. . . . Consequently, proposed breach of warranty and consumer classes of 'all owners and lessors' <u>are frequently rejected because the proposed class manifestly includes persons who have not suffered any injury because their product</u>

<u>performed exactly as expected</u>.  Those persons would have no standing to sue as individuals, and therefore may not be included in the classes.

1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 5:53 (2006) (emphasis added). Indeed, a certified class action is merely a "procedural device aggregating multiple persons' claims," and it "does not entitle anyone to be in litigation," *Caudle v. Am. Arbitration Ass'n*, 230 F.3d 920, 921 (7th Cir. 2000), nor does the device "alter the parties' burdens of proof, right to a jury trial, or the substantive prerequisites to recovery under a given tort," *Blaz v. Belfer*, 368 F.3d 501, 504 (5th Cir. 2004).

Here, Plaintiffs' proposed classes are fatally overbroad because the classes are composed almost entirely of HE washer buyers who have suffered no legally cognizable harm.  (*See* Ex. 1 ¶ 7 & Tables 3-4.)  Plaintiffs' proposed nationwide class includes "[a]ll persons or entities residing in the United States" who bought an HE washer (Compl. ¶ 84), and Plaintiffs' proposed subclasses include "[a]ll Class members" who bought an HE washer who reside in the named plaintiffs' respective home states (*id.* ¶ 85).  The overwhelming majority of HE washer owners, however, have not experienced any similar problem with, or required repairs of, their HE washers, and therefore have suffered no injury or actual damage at all because they received exactly what they bargained for.  (*See* Ex. 2 ¶ 7 & Tables 3-4.)  Moreover, among the tiny fractions of Kenmore Access and Kenmore Horizon owners who have experienced a potential mold-mildew problem  (1.84% and .50%, respectively), many of those owners received repairs under either Sears' written warranty or a service contract, and thus they incurred no out-of-pocket repair expenses.  (*See, e.g.*, Compl. ¶¶ 65-66 (Plaintiff Napoli's first service call was within the initial one-year warranty period and the second service call was covered by his service contract); Ex. 1 ¶ 6 & Table 1 (showing that 48% of Kenmore Access owners bought a Sears service contract for service coverage after the initial one-year warranty period); *id.* Table 2 (showing that 36% of Kenmore Horizon owners bought a Sears service contract).)

Where, as here, the allegations in the complaint show that the proposed class is overbroad, it is appropriate to strike the class allegations.  *See, e.g.*, *In re Aiello*, 231 B.R. 693, 709 (N.D. Ill. 1999) ("The proposed class is overly broad in that it is not restricted to class members who suffered actual damages in some form or another. . . .  The failure to require injury in the class parameters is a fatal defect.  Therefore, this Court must grant the motion to strike the class allegations."); *Kubany v. Sch. Bd.*, 149 F.R.D. 664, 665 (M.D. Fla. 1993) (granting motion to strike class allegations where the plaintiff filed claims on behalf of 96,100 students, but many,

if not most, of those students did not share the named plaintiff's claims); *Miller v. Motorola, Inc.*, 76 F.R.D. 516, 518 (N.D. Ill. 1977) (granting motion to strike class allegations where the class definition was overly broad); *cf. In re Canon Cameras Litig.*, 237 F.R.D. 357, 359 (S.D.N.Y. 2006) (denying class certification where "fewer than two-tenths of one percent of the cameras here in issue have been reported as having even arguably malfunctioned").

### A.     The Vast Majority of HE Washer Owners Do Not Have a Claim for Economic Loss Based on an Alleged Defect That Has Never Manifested

Plaintiffs' proposed classes purport to include all HE washer owners on the theory that all owners were damaged at the time they bought their washers because they "overpaid for the Machines because the value of the Machines was diminished at the time that they were sold to consumers." (Compl. ¶ 30.)  Nearly every court that has considered the issue has denied recovery based on an alleged latent product defect that has not manifested itself or caused a malfunction.  *See Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 630 (8th Cir. 1999) ("An overwhelming majority of courts have dismissed these unmanifested defect claims and rejected the idea that the Plaintiffs can sue manufacturers for speculative damage."); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y. 1997) ("It is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own." (internal quotation marks omitted)).

For example, courts in a majority of jurisdictions do not recognize a breach of warranty claim unless the plaintiff has actually experienced a product malfunction.[10]  These courts

---

[10] *See, e.g., In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1017 (7th Cir. 2002) (reversing certification of no-injury class brought on claims of breach of warranty and consumer fraud and recognizing that "[n]o injury, no tort, is an ingredient of every state's law"); *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297-98 (4th Cir. 1989) (affirming dismissal of MMWA implied-warranty claims where the plaintiffs alleged damages attributable only to lost resale value, but did not allege that their automobiles experienced mechanical difficulties); *In re Gen. Motors Type III Door Latch Litig.*, Nos. 98 C 5836, MDL 1266, 2001 WL 103434, at *2-5 (N.D. Ill. Jan. 31, 2001) (granting summary judgment in favor of the defendant on implied-warranty claim where the plaintiffs failed to show that their products had malfunctioned or caused them some specific injury); *Jarman v. United Indus. Corp.*, 98 F. Supp. 2d 757, 767-68 (S.D. Miss. 2000) (dismissing warranty claim where the plaintiff failed to allege that pesticide product actually failed to perform in the manner represented or that he had suffered any damage through his use of the product); *Weaver*, 172 F.R.D. at 99-100 (dismissing implied-warranty claim because the plaintiff's integrated child seat never exhibited the alleged defect); *Hubbard v. Gen. Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018, at *3 (S.D.N.Y. May 22, 1996) (dismissing claims of breach of express and implied warranties and fraud under New York law, holding that "[p]urchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not

recognize that, absent an actual malfunction, the plaintiffs cannot establish the required element of damages.  *See, e.g.*, *Briehl*, 172 F.3d at 627-28 ("Since the Plaintiffs failed to allege that any defect had actually manifested itself in their vehicles, the Plaintiffs' allegations of damages failed to meet the pleading requirements for defective products. . . .  The Plaintiffs' assertion that their ABS-equipped vehicles are defective and that they have suffered a loss in resale value as a result of the defect is insufficient as a matter of law to plead a claim under any theory the Plaintiffs have advanced."); *cf. Barbarin v. Gen. Motors Corp.*, No. 84-0888, 1993 WL 765821, at *1-2 (D.D.C. Sept. 22, 1993) ("[A] contrary rule would, in effect, contemplate indemnity for a potential injury that never, in fact, materialized; compensation would have to be paid for a product 'defect' that was never made manifest, in a product that for the life of any warranty actually performed as the warrantor guaranteed it would.").  For the same reason, the majority of courts that have considered the issue bar class claims for unjust enrichment and violations of consumer protection statutes where the plaintiffs have not experienced a product malfunction.[11]

---

manifested itself in the product they own"); *Yost v. Gen. Motors Corp.*, 651 F. Supp. 656, 657-58 (D.N.J. 1986) (dismissing warranty claim where the plaintiff did not allege he had suffered any damages as a result of purported defect in his vehicle's engine); *Am. Suzuki Motor Corp. v. Super. Ct.*, 44 Cal. Rptr. 2d 526, 531 (Cal. Ct. App. 1995) (denying certification of proposed class of Suzuki Samurai owners who alleged that they had bought vehicles having an unacceptable risk of a roll-over but whose vehicles had not manifested the alleged defect).

[11] *See, e.g.*, *Pratt v. Panasonic Consumer Elecs. Co.*, 2006 WL 1933660, at *2-3, 10-11 (N.J. Super. Ct. July 12, 2006) (denying certification of claims for violation of consumer protection statutes, unjust enrichment, and breach of implied warranty where the plaintiff sought to represent a nationwide class of all purchasers of six different models of DVD players and where the overwhelming majority (more than 98%) of purchasers had not suffered from the alleged defect); *Perkins v. DaimlerChrysler Corp.*, 890 A.2d 997, 1004 (N.J. Super. Ct. App. Div. 2006) ("[A] claim that a defect may, but has not, manifested itself until after the expiration of the warranty period cannot form the basis for a claim under the CFA."); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 854-86 (Tex. App. 2005) (affirming dismissal of warranty and fraudulent concealment claims because the plaintiffs' door latch never exhibited the alleged defect); *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 237 (Wis. 2004) ("An allegation that a product is diminished in value because the product line has demonstrated a propensity for premature failure such that the product might or will at some point in the future fail prematurely is too uncertain and speculative to constitute a legally cognizable tort injury and is therefore insufficient to state damages in a tort claim for fraud."); *Canon Cameras*, 237 F.R.D. at 360 (denying class certification because majority of class members could not prove element of damages essential to their claims for unjust enrichment, implied warranty of merchantability, or violation of consumer protection statute because the majority of putative class members' cameras never manifested the alleged defect); *Briehl*, 172 F.3d at 627-28 (affirming dismissal of fraudulent concealment claim and violation of consumer protection statutes for failure to adequately allege damages where the plaintiffs did not allege that their ABS brake systems had malfunctioned or failed); *Weaver*, 172 F.R.D. at 99-100 (dismissing claims for common-law fraud and violation of consumer protection statute because plaintiff's child seat had not exhibited the defect).

Here, with respect to the HE washer owners whose washers have not manifested the problems alleged in the Complaint, Plaintiffs have failed to plead facts that, if true, would show that the putative classes have suffered damages, and damages are an essential element of each of Plaintiffs' claims.[12]  Therefore, Plaintiffs' putative classes are fatally over-inclusive because they consist almost entirely of class members who would not have standing to assert a cause of action on their own behalf.  *See Clay*, 188 F.R.D. at 490.

> **B.    The Overwhelming Majority of HE Washer Owners Do Not Have Any Claim for Cost-of-Repair Damages or Other Out-of-Pocket Damages Because They Have Not Incurred Any Such Repair Costs or Damages**

Under Plaintiffs' second class-wide damages theory—namely, that the putative class members suffered damages by paying money to repair the washers (*e.g.*, Compl. ¶¶ 134, 174), or to replace clothing washed in machines that had developed a moldy odor (*id.* ¶¶ 29, 31)—the class definition is over-inclusive because the vast majority of HE washer owners have not had to pay for any service call that might be related to a mold-mildew or odor problem (Ex. 1 ¶ 7 & Tables 3-4), and presumably also have not paid to replace clothing washed in such a machine.

In the *General Motors Type III Door Latch Litigation*, the district court granted summary judgment for the defendant on the plaintiffs' claims for violation of the Illinois Fraud Act, common-law fraud, violation of the Texas consumer fraud act, and breach of implied warranty because the plaintiffs' allegedly defective door latches had never malfunctioned or required repair.  2001 WL 103434, at *2-3.  The court rejected the plaintiffs' cost-of-repair damages theory, stating, "I join the majority of courts which have held that a plaintiff's product must malfunction or cause him some specific injury before he can sue for the cost of repair."  *Id.* at 4.  *See also Pfizer, Inc. v. Farsian*, 682 So. 2d 405, 407 (Ala. 1996) (holding that the plaintiff's belief that a product would fail in the future is not, without more, an injury sufficient to support a claim).  Similarly, here, the vast majority of putative class members have not incurred repair costs and have not suffered other out-of-pocket damages, and, therefore, they do not have

---

[12] To the extent that the law in any particular state is unsettled on the issue, the existence of that uncertainty itself counsels against class certification.  *See Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 679-80 (Tex. 2004) (reversing class certification in part because question of whether some states recognized claim for latent defects was unsettled, observing that class certification is not appropriate in cases where "judges and lawyers had to guess, 'What *is* the law of Michigan, or Arkansas, or Guam, as applied to this problem?'" (internal citation omitted) (emphasis in original)).

standing to bring individual claims to recover theoretical costs of repair under any claim pled in the Complaint. *Cf. Clay*, 188 F.R.D. at 490.

## II.    PLAINTIFFS' MMWA CLASS ALLEGATIONS SHOULD BE STRICKEN FOR FAILURE TO NAME 100 PLAINTIFFS IN THE COMPLAINT

Plaintiffs seek relief for alleged MMWA violations, but MMWA imposes a 100-named-plaintiff requirement for class actions. 15 U.S.C. § 2310(d)(3)(C) ("No claim shall be cognizable in a suit brought under paragraph (1)(B) of this subsection . . . (C) if the action is brought as a class action, and the number of named plaintiffs is less than one hundred."). Courts strictly construe this requirement. *E.g.*, *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1114 n.2 (7th Cir. 1979) ("The number of named plaintiffs required, however, remains a substantial barrier to maintaining class actions under the Act. It was enacted by Congress to prevent 'trivial or insignificant' class actions from being brought in the federal courts." (quoting H.R. Rep. No. 93-1107 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7702, 7724)). Because Plaintiffs name only nine plaintiffs, the Court should strike paragraphs 93-110 from their Complaint.

## III.   PLAINTIFFS' ALLEGATIONS AND THE HE WASHERS' SERVICE HISTORY SHOW THAT PLAINTIFFS' CLAIMS ARE ATYPICAL

A plaintiff may sue as a class representative only if "the claims or defenses of the representative part[y] are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A plaintiff's claims are typical only if they arise from the same course of conduct that underlies the claims of the other putative class members. *See Williams v. Ford Motor Co.*, 192 F.R.D. 580, 585 (N.D. Ill. 2000). In evaluating typicality, "[t]he Court should concentrate on the defendants' alleged conduct and the plaintiffs' legal theory . . . ." *Clay*, 188 F.R.D. at 491.

Here, Sears' alleged conduct is the sale of an allegedly defective washing machine without disclosing the alleged defect to Plaintiffs and the putative class members and without satisfying its written warranty obligations. (*See* Compl. ¶¶ 2, 22, 24, 26-28.) Plaintiffs' legal theory is that they were harmed because they "overpaid" for allegedly defective washing machines that malfunctioned as a result of the defect, because Sears did not repair or replace the machines despite a lifetime warranty on the stainless steel drum, and because they paid to replace clothes and other items that have been "ruined" by the defect. (*Id.* ¶¶ 25-32.) Thus, to satisfy Rule 23(a)(3)'s typicality requirement, Plaintiffs must plead and prove, among other things, that the HE washers they bought suffer from a defect that is common to the putative classes (*i.e.*, a

defect shared by all HE washers) and that has caused a class-wide injury (*e.g.*, a common malfunction that allegedly required the same repair or replacement).[13]

Aside from the conclusory assertion that "the stainless steel drums" and "the door seal" somehow "play a role in the accumulation of mold and mildew" (Compl. ¶ 25), Plaintiffs offer no specific or particularized allegations that identify the alleged "design defect" that is common in all HE washers. Without factual allegations supporting the existence of a common defect causing a class-wide injury, Plaintiffs have failed to make a threshold showing that their claims are typical of the claims of the putative class members. *See, e.g.*, *Lumpkin*, 161 F.R.D. at 482 (striking class allegations in part because they failed to satisfy Rule 23(a)(3)); *Kubany*, 149 F.R.D. at 665 (same). To the contrary, as the available service data show, all HE washers are not subject to the same mold and mildew problem, and the overwhelming majority of owners have no claims against Sears. (Ex. 2 ¶ 7 & Tables 3-4.) Given the rarity of noticeable mold-mildew and odor, there is no basis to assume that all HE washers suffer from a common defect.

A recent decision in the Southern District of Florida in a similar case is squarely on point. In *Dennis v. Whirlpool Corp.*, the named plaintiffs filed a putative class action on behalf of all owners of KitchenAid-brand side-by-side refrigerators, alleging that the refrigerators were defective because the plastic cavity liner was "prone" to cracking. (*See* Ex. 12.) The court struck the plaintiffs' class allegations on typicality grounds, among others, because the defendant's service data showed that "only about .31% of all KitchenAid refrigerators sold in the United States since January 1, 2000 have needed a service call relating to cracking of the cavity liner." (*Id.* at 5.) The court concluded that the low failure rate showed that the plaintiffs' claims were not typical of the putative class of KitchenAid refrigerator owners:

> The Complaint and the KitchenAid service data show . . . that all machines are not subject to the same liner cracking problem and that the majority of owners have no claims against Defendant. Most owners bought, and had used for years without requiring repairs, refrigerators that had provided those owners with the bargained for benefits.

(*Id.*)

---

[13]  Although this motion does not seek to strike Plaintiffs' class allegations based on their failure to plead facts that satisfy the other Rule 23(a) requirements, Sears will, if this case should proceed to a class-certification motion, show that Plaintiffs cannot meet other requirements either.

Here, likewise, Sears' customer and service data reveal that most HE washer owners have not experienced the problems experienced by Plaintiffs and, therefore, have no claim against Sears. Absent any factual allegations supporting a reasonable inference that Plaintiffs share a judicially cognizable problem common to the classes they purport to represent, Plaintiffs cannot satisfy Rule 23(a)(3). *See Oshana v. Coca-Cola, Inc.*, 472 F.3d 506, 514 (7th Cir. 2007) (holding that the plaintiff's claim was not typical of proposed class because the "proposed class includes people who knew fountain Diet Coke contained saccharin and bought it anyway"); *Williams*, 192 F.R.D. at 586 (denying certification of "overbroad class" for want of typicality where the vast majority of putative class members could not allege the sort of claim or injury plaintiff complains of"); *Bethards v. Bard Access Sys., Inc.*, No. 94 C 1522, 1995 WL 75356, at *5 (N.D. Ill. Feb. 22, 1995) (denying class certification on typicality grounds because "patients implanted with the HP 8 Catheter who have not experienced displacement cannot maintain a cause of action in either strict liability or breach of implied warranty since they sustained no injury and suffered no damages"); *Martin v. Am. Med. Sys., Inc.*, No. IP 94-2067-C-H/G, 1995 WL 680630, at *5 (S.D. Ind. Oct. 25, 1995) (denying class certification on typicality grounds because the "proposed class definition does not differentiate between AMS Series 700 recipients who have experienced difficulties or malfunctions with their implants and AMS Series 700 recipients who have had absolutely no problem with their implants").

Even if each Plaintiff were to prove that he or she bought and was damaged by a defective HE washer that accumulated noticeable mold-mildew and odors, and that Sears failed to repair or replace the washer pursuant to an applicable warranty, that Plaintiff would not have proved any other class member's claims. Plaintiffs' claims are atypical on that ground alone.

## IV. INDIVIDUAL QUESTIONS OF FACT AND LAW DOMINATE PLAINTIFFS' CLASS CLAIMS FOR MONEY DAMAGES, MAKING A CLASS ACTION INFERIOR AND UNMANAGEABLE

Rule 23(b)(3) requires that common issues of fact or law predominate over individual issues. Fed. R. Civ. P. 23(b)(3). The Seventh Circuit has fashioned a two-step analysis for analyzing whether Rule 23(b)(3)'s predominance requirement has been met:

> Our inquiry into the predomination analysis must take two steps. Our first focus must be on the substantive elements of plaintiffs' cause of action and inquire into the proof necessary for the various elements. Second, after examining the proof necessary we must inquire into the form that trial on these issues would take.

*Simer*, 661 F.2d at 672-73.  This analysis must be undertaken for each asserted claim.  *McDaniel v. Qwest Commc'ns Corp.*, No. 05 C 1008, 2006 WL 1476110, at *15 (N.D. Ill. May 23, 2006).

Plaintiffs cannot satisfy either of Rule 23(b)(3)'s requirements.  The liability and damages elements of each of Plaintiffs' claims—violations of consumer protection statutes, breach of express warranty, breach of implied warranty, and unjust enrichment—will turn not on facts common to all owners, but on facts unique to each owner.  The putative class members own different models of HE washers from different model years and with different features, made their purchase decisions for different reasons after receiving different representations (if any) from Sears or third parties, treated their machines differently and used different detergents in different amounts, experienced different alleged problems (if any), made different efforts at remediation (if any), had different warranties and extended service plans, and received different remedies (if any).  (*See* Statement of Facts, *supra*.)  Moreover, because the proposed nationwide class seeks to include members from all 50 states and the District of Columbia, the Court would be required to undertake a 51-part legal analysis.  Accordingly, class treatment is inappropriate.

A.    **Individual Questions of Law Dominate Plaintiffs' Putative Class Claims**

In a multistate or nationwide class action, the court must engage in a three-step analysis in determining which state's or states' laws to apply:  First, is there a conflict of law?  Second, if there is a conflict, which state's laws should apply pursuant to the forum state's choice-of-law rules?  Third, does application of that law conform with due process?  *Cf. Sun Oil Co. v. Wortman*, 486 U.S. 717, 731-34 (1988); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05 C 4742, 05 C 2623, 2006 WL 3754823, at *1-3 (N.D. Ill. Dec. 18, 2006).  Common issues of law cannot predominate if, as here, adjudication of the class claims would require the application of numerous states' varying substantive warranty laws.  *See Bridgestone/Firestone*, 288 F.3d at 1017-18.

1.    **The laws regarding Plaintiffs' MMWA, consumer fraud, warranty, and unjust enrichment claims vary from state to state**

Although Plaintiffs bear the burden of conducting an extensive conflicts analysis and showing that state law variations do not present insurmountable obstacles to certification, *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 313 (5th Cir. 2000), it already is clear that Plaintiffs cannot do so.  As an initial matter, by pleading consumer fraud, warranty, and unjust enrichment claims under their respective home state's substantive laws, Plaintiffs impliedly admit that their

respective home state's laws apply to their respective individual claims and that these substantive laws differ in material respects.  (*See* Compl. ¶¶ 111-370.)[14]

Plaintiffs also assert claims for violation of the MMWA on behalf of the nationwide class for breach of Sears' written warranties (Compl. ¶¶ 93-101) and on behalf of all seven subclasses for breach of implied warranty (*id.* ¶¶ 102-110).  A claim for violation of the MMWA, however, "calls for the application of state written and implied warranty law, not the creation of additional federal law."  *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1012 (D.C. Cir. 1986).  In *Walsh*, the D.C. Circuit rejected the plaintiffs' argument that state law was inapplicable to claims under the MMWA and remanded the case for an examination as to whether variations in state law on breach of express and implied warranties prohibit a finding of predominance that would permit class certification.  *Id.*  As to the written warranty claims, the *Walsh* court explained that, although the Act provided a self-contained definition of "written warranty" that did not reference state law (in contrast to the subsection defining "implied warranty"), the reason for the self-contained definition was because Congress "ultimately decided that oral warranties need not be covered in the federal legislation unless and until they become 'more prevalent.'  Because the state law term 'express warranty' did not suit the limited federal purpose, Congress supplied a definition—one confined to 'written warranty'—that did."  *Id.* at 1015.  Given Congress's intent that the MMWA not displace state warranty law beyond the Act's explicit prescriptions, the *Walsh* court concluded that "state warranty law lies at the base of all warranty claims under Magnuson-Moss."  *Id.* at 1016.[15]

---

[14] *See also Bridgestone/Firestone*, 288 F.3d at 1018-19 (reversing certification of nationwide class because the laws of 50 states and the District of Columbia would apply to class claims for fraudulent concealment, breach of warranty, consumer fraud, and unjust enrichment and because they vary substantially from one another); *Sears Tools Mktg.*, 2006 WL 3754823, at *2 n.3 (differences exist among states' unjust enrichment laws); *Lilly v. Ford Motor Co.*, No. 00 C 7372, 2002 WL 507126, at *2-3 (N.D. Ill. Apr. 3, 2002) (denying certification of unjust enrichment and consumer fraud claims because litigation would be unmanageable due to application of varying laws); *Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365, 371 (N.D. Ill. 1998) (certification denied because "troublesome variations" among the fifty states' consumer fraud statutes, including differences in scienter and reliance elements, as well as statutes of limitations and notice requirements); *Clay*, 188 F.R.D. 483 (definition of "unjust enrichment," availability of remedy, and applicable defenses vary).

[15] *See also Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 525 (7th Cir. 2003) ("Because [the implied warranty provisions of the Act] do not modify, or discuss in any way, a state's ability to establish a privity requirement, whether privity is a prerequisite to a claim for breach of implied warranty under the Magnuson-Moss Act therefore hinges entirely on the applicable state law."); *In re Gen. Motors Corp.*

The laws of the 50 states and the District of Columbia regarding claims for breach of warranty vary substantially. *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 730 (5th Cir. 2007). In *Cole*, the Fifth Circuit stated:

> [T]here are numerous variations in the substantive laws of express and implied warranty among the fifty-one jurisdictions that the plaintiffs failed to "extensively analyze" for their impact on predominance. . . . [W]e note that many of the variations in state law raise the potential for the application of multiple and diverse legal standards and a related need for multiple jury instructions. For some issues, variations in state law also multiply the individualized factual determinations that the court would be required to undertake in individualized hearings. Specifically, the laws of the jurisdictions vary with regards to (1) whether plaintiffs must demonstrate reliance, (2) whether plaintiffs must provide notice of breach, (3) whether there must be privity of contract, (4) whether plaintiffs may recover for unmanifested vehicle defects, (5) whether merchantability may be presumed and (6) whether warranty protections extend to used vehicles.

*Id*. at 726. *See also Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 276 (D.D.C. 1990) (finding that the proposed written-warranty class failed to satisfy Rule 23(b)(3)'s predominance requirement because "[i]ssues such as notice or presentment of the defect, refusal of service and the measure of damages will be governed by the varying warranty laws of the relevant jurisdictions"); *Gen. Motors Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. at 318-24 (finding lack of predominance for express-warranty claim under MMWA where there were "significant variations with respect to the law of warranty," including the law of reliance on the seller's statements, among the 47 states at issue in the proposed class).

Further, with respect to Plaintiffs' implied-warranty claims, the laws of the seven states at issue in the Second Cause of Action—Arizona, Colorado, Florida, Ohio, Oklahoma, Pennsylvania, and Wisconsin—vary considerably on issues such as liability, privity, and notice. *See Walsh*, 130 F.R.D. at 271 ("[T]he Court finds numerous variations exist among states' laws concerning the scope and application of implied warranty claims. It finds that state law also varies on related issues such as vertical privity requirements, contractual limitations of implied warranties, limitations on plaintiffs' remedies and affirmative defenses available to the defendant."). That Plaintiffs' MMWA implied-warranty claim involves the application of the

---

*Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 315 (S.D. Ill. 2007) (holding that breach of express warranty claims brought under MMWA are controlled by state law and require a choice-of-law analysis).

laws of seven states, rather than all 50 states like the MMWA express-warranty claim, does not change the fact that the Court will need to apply significantly varying laws of several states to determine the merits of a single class claim. *See, e.g.*, *So. States Police Benevolent Ass'n, Inc. v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 93 (D. Mass. 2007) ("[I]f Subclass A is certified, the Court will need to apply the laws of the eight different states. . . . After review of the subject consumer protection laws, this Court concludes that variances in the substantive prerequisites of such claims render a certification of Subclass A unmanageable and contrary to the fair and efficient adjudication of this matter."); *Doll v. Chi. Title Ins. Co.*, 246 F.R.D. 683, 689 (D. Kan. 2007) (denying certification where the analysis of 17 different states' laws made the class action an unmanageable vehicle); *Commander Props. Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529, 541 (D. Kan. 1995) (holding that individualized legal issues predominated because "it appears that this analysis will inevitably involve the law of several different states").

    **2.**    **For Plaintiffs' MMWA claims, Illinois conflicts-of-law rules require the application of the laws of the class members' states of purchase**

If, as here, there are conflicts of law, Illinois subscribes to the Restatement of Conflict of Laws' "most significant contacts" approach to ascertain which law to apply. *Vantassell-Matin v. Nelson*, 741 F. Supp. 698, 702-03 (N.D. Ill. 1990). Under this approach, each state's contacts must be evaluated using a three-step "interest" analysis: First, isolate the individual issues in the case; next, identify the policies embraced in the law of competing states; finally, examine the contacts of the respective jurisdictions to determine which state has a superior connection with the occurrence or transaction, and thus a superior interest in having its law applied to the dispute. *See id.* This includes consideration of "(1) the place where the injury occurred, (2) the place where the conduct occurred, (3) the parties' domiciles, nationality, place of incorporation, and place of business, and (4) the place where the parties' relationship is centered." *Barbara's Sales, Inc. v. Intel Corp.*, 857 N.E.2d 717, 722 (Ill. App. Ct. 2006).

The district court's decision in *Sears Tools Marketing*, outlines the applicable Illinois conflicts analysis. 2006 WL 3754823, at *3.[16] There, citizens of several states, on behalf of themselves and others throughout the United States, sued Sears for alleged deceptive marketing

---

[16] *See also Anabaldi v. Sunbeam*, 651 F. Supp. 1343, 1344-45 (N.D. Ill. 1987) (under Illinois choice-of-law principles, Pennsylvania warranty law applied to case involving defective fryer, even though the defendant had its principal place of business in Illinois).

of its Craftsman® tools.  *Id.* at *1.  Ruling on Sears' motion to dismiss the unjust enrichment claim, the Court concluded that it was required to apply the laws of the various states where the individual plaintiffs bought their tools:

> The place of the injury here (or, in unjust enrichment terms, the place where plaintiffs allegedly "conferred" the benefit on defendant) is the plaintiffs' home states where they purchased Sears's tools.  The place where the parties' relationship is centered is the plaintiffs' home states as well.  Plaintiffs saw the allegedly misleading advertising in those states, and they purchased the tools (which were located there) in those states as well.  Plaintiffs contend that the relationship is centered in Illinois because plaintiffs purchased the tools "by virtue of" Sears's nationwide advertisements, which were conceived of and sent from Illinois. . . .  This characterization rings hollow.  The relationship arose from plaintiffs' purchases of Craftsman tools, which occurred in plaintiffs' home states.

*Id.* at *2 (citation omitted).  The Court found that, although Sears was headquartered in Illinois, the plaintiffs' respective home states have an interest in regulating the business that takes place within their borders.  *Id.* at *3.

Here, Illinois choice-of-law rules advise that the laws of the states of purchase— including all 50 states and the District of Columbia for the written-warranty claim—apply to the MMWA claims.  Members of the putative nationwide class acquired their respective HE washers in all 50 states and the District of Columbia.  Owners presumably experienced a defect, if any, and were exposed to Sears' marketing and sales activity, if any, within their home states. Moreover, even though Sears is headquartered in Illinois, Sears sells its washing machines throughout the country.  Lastly, Sears and the putative class members encountered each other in the consumers' respective home states; the putative class members did not need to travel to or contact Sears in Illinois to buy their washers.  Thus, the most important factors in this case—the place of sale, delivery, use, and alleged injury, and the center of the parties' relationship—show that each of the 51 jurisdictions has the strongest interest in applying its own warranty laws to disputes between its residents and Sears.

### 3.    Individual issues of law dominate Plaintiffs' putative class claims

Predominance of common issues of law is lacking where a court is required to apply varied state substantive laws.  *See Am. Med. Sys.*, 75 F.3d at 1085 ("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action."); *Drooger v. Carlisle Tire & Wheel Co.*, No. 1:05-CV-73, 2006 WL 1008719,

at *9 (W.D. Mich. Apr. 18, 2006) ("The great weight of authority observes that when class claims cannot be brought under a unifying law, predominating questions of law are absent, and certification is inappropriate."). Thus, because Plaintiffs' putative class claims would require the application of 51 different jurisdictions' express warranty laws and <u>at least</u> seven states' implied-warranty, consumer fraud, and unjust enrichment laws, individual questions of law predominate.

### B.    Individual Issues of Fact Dominate All of Plaintiffs' Putative Class Claims

Although Plaintiffs purport to identify 11 common questions of fact or law (Compl. ¶ 88), it is apparent that those questions are not in fact "common" to the proposed classes in the relevant sense—*i.e.*, the questions cannot be formulated in the same, uniform manner for each Plaintiff and class member, and, more importantly, the <u>answers</u> to the questions do not rest on uniform facts and evidence, and will not be answered the same way, for every HE washer owner. Given Plaintiffs' own allegations and the Kenmore Access and Kenmore Horizon washers' service histories, there are numerous individual questions of liability and damages, and therefore Plaintiff's claims cannot, as a matter of law, be certified for class treatment.

At a minimum, every claim pled in the Complaint requires Plaintiffs to plead and prove that they experienced a product malfunction and incurred actual damages that were proximately caused by the defect and Sears' actions or inactions. With respect to Plaintiffs' claims for violations of consumer fraud statutes, and by extension the unjust enrichment claims that are based on Sears' allegedly wrongful conduct,[17] the proximate cause inquiry focuses on whether the individual plaintiff received or was exposed to the alleged misrepresentation, or the statement that was misleading due to a material omission, and whether the alleged misrepresentation or non-disclosure was the proximate cause of that plaintiff's alleged injuries. (*See* cases cited in Ex. 13 § II.) With respect to the warranty claims generally, the breach and proximate cause elements focus on whether the alleged defect in the HE washers and Sears' failure to repair the alleged defect was the proximate cause of each Plaintiff's problems and injuries (*i.e.*, the failure of the product to operate in a manner consistent with its ordinary intended use or as Sears expressly warranted). (*Id.*)

---

[17] *See In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05 C 4742, 05 C 2623, 2007 WL 4287511, at *9 (N.D. Ill. Dec. 4, 2007) ("Plaintiffs' unjust enrichment claim is based on wrongful conduct—fraud. Generally speaking, then, plaintiffs will have to demonstrate that they were deceived by Sears's advertising and marketing; that as a result, they conferred a benefit on Sears; and that it would be unjust for Sears to retain that benefit.").

### 1.    The elements required to prove violations of the consumer protection statutes will necessitate individualized fact determinations

According to Plaintiffs, Sears failed to disclose that the HE washers contained an alleged design defect that manifests as mold and mildew accumulation and odors, and Sears misrepresented the HE washers as reliable and free from defects.  (Compl. ¶¶ 2, 24-29, 37-39.) Plaintiffs' allegations relevant to their claim that Sears' alleged misrepresentations and omissions were the proximate cause of Plaintiffs' alleged injuries reads: "If Plaintiffs and other members of the Class had known about the design defects affecting the Washing Machines, they would not have purchased the Washing Machines, or would have paid significantly less for the Washing Machines."  (*Id.* ¶ 30.)  When the Court "inquire[s] into the form that trial on these issues would take," *Simer*, 661 F.2d at 672-73, it is apparent that there would have to be a class member-by-class member inquiry on the questions of representations and proximate cause.

Where, as in this case, there is no well-pled factual allegations or evidence showing that the defendant engaged in a uniform course of conduct in sales presentations to the putative class members, Plaintiffs' and the class members' consumer fraud claims will require individual factual determinations, including what statements were made or not made to each class member and whether each class member heard, received, or relied on the statements by Sears or third parties.[18]  This is especially true here, because at least some of the owner's manuals on which Plaintiffs rely contain explicit statements regarding washer odor and preventive maintenance steps that owners should take to keep their washing machines smelling fresher and cleaner

---

[18] *See, e.g.*, *In re St. Jude Med., Inc. Silzone Heart Valve Prods. Liab. Litig.*, 522 F.3d 836, 838-39 (8th Cir. 2008) (noting that whether each patient class member had received a representation, or what information was received, varied widely just among the five named plaintiffs, thus indicating that it would "likely [] be a significant issue in each case of alleged liability"); *Oshana*, 225 F.R.D. at 586 ("Without determining what each member heard, saw, or knew, it is impossible to assign liability. . . . Each potential class member likely had varying degrees of knowledge, if any, regarding fountain diet Coke's contents due to varying exposure to various representations.  These highly individualized factual determinations preclude certification." (citation omitted)); *Clark v. Experian Info., Inc.*, 233 F.R.D. 508, 512 (N.D. Ill. 2005) ("The nature of the plaintiffs' claims require an individualize[d] person-by-person evaluation of what the potential class members viewed on the defendants' website, the potential class member's understanding of and reliance on this information, and what damages, if any, resulted."); *Solomon v. Bell Atlantic Corp.*, 9 A.D.3d 49, 52-53 (N.Y. App. Div. 2004) ("[C]lass certification is not appropriate where the 'plaintiffs do not point to any specific advertisement or public pronouncement by the [defendants] . . . which was undoubtedly seen by all class members.'" (citations omitted)).

(Compl. ¶¶ 22-23; Exs. 3-9),[19] and because the fact that modern high-efficiency washers generally can promote <u>noticeable</u> mold-mildew more readily than older, less efficient washing machines has been well-documented and publicized (*e.g.*, Ex. 2 ¶¶ 20-21 & Exs. B-D).

Plaintiffs try to plead around this obstacle to class certification by drafting the Complaint so as to give the impression that Sears' alleged misrepresentations and omissions were uniform across the putative classes (*i.e.*, that Sears did not disclose the alleged facts to <u>any</u> buyer of any HE washer and misrepresented to <u>all</u> buyers that the machines were reliable and free from defects) and that reliance on the alleged misrepresentations and omissions was therefore uniform.[20] (*See* Compl. ¶¶ 2, 3, 27, 28, 32, 33, 38, 39, 42, 44.)  Given the tiny fractions of Kenmore Access and Kenmore Horizon washer owners who have experienced any noticeable mold or mildew, however, it is not even clear that <u>any</u> of the putative class members could prove that they relied on Sears' alleged omission regarding the machines' potential to promote noticeable mold-mildew compared to older, less efficient washers.  (Ex. 1 ¶ 7; Ex. 2 ¶¶ 16-21.)  That is, when those mold-mildew complaint rates are compared with the considerably higher

---

[19] For example, the Owner's Manual that accompanied Plaintiff Bettua's HE3 washer states:

> **Washer Odor**
>
> - **See "Cleaning Your Washer."**
>
> - **Are you using HE detergent?**
>   Use of non-HE detergent can cause a film residue which can result in odor.
>
> - **Did you leave the door open after use?**
>   This washer has a tight seal to avoid water leaks.  To avoid odors, leave the door open to allow the washer to dry between uses.

(Ex. 4 at 22.)  Similar language appears in other HE washers' owner's manuals, along with detailed instructions for "Cleaning Your Washer" and "to maintain washer freshness."  (*Id.* at 19-20; Ex. 3 at 19-20, 22; Ex. 8 at 20-21.)  Most of the owner's manuals also instruct the owner regarding the importance of using HE detergent, such as the following: "Using regular detergent will likely result in washer errors, longer cycle times and reduced rinsing performance.  It may also result in component failures and noticeable mold or mildew."  (Ex. 3 at 13; *see also* Ex. 4 at 12; Ex. 6 at 12; Ex. 8 at 12; Ex. 9 at 12.)

[20] A "district court does not and should not talismanically accept the plaintiff's factual allegations as true when determining whether to certify a class."  *Hamilton v. O'Connor Chevrolet, Inc.*, No. 02 C 1897, 2006 WL 1697171, at *3 (N.D. Ill. June 12, 2006).  It is necessary to "probe behind the plaintiff's allegations or assertions . . . to determine whether, if the class were certified, the issues presented could fairly and confidently be resolved with respect to all the absent class members based on the proof offered on behalf of only the named plaintiff(s)."  *Id.*

range of repair rates for all new front-loading washers across the industry (Ex. 2 ¶ 23 & Ex. E; Ex. 10 at 47), it is questionable whether any of the more than 2,500,000 putative class members would have bought a different machine, or attempted to negotiate a lower price, if Sears had both known and disclosed the Kenmore Access washer's historical risk (1.84%) or the Kenmore Horizon washer's historical risk (0.50%) of developing noticeable mold-mildew during the life of the washer.[21]  This is especially true because all high-efficiency front-loading washing machines, of any make or model, generally can promote noticeable mold-mildew more readily than older, less efficient machines, and there are simple, widely known measures that owners can take to control or prevent mold-mildew growth.  (Ex. 2 ¶ 20.)  In light of the many benefits front-loading washing machines provide over conventional top-loading washing machines (*id.* ¶¶ 8-15 & Ex. A), it strains credibility for Plaintiffs to argue that all (or even most) HE washer buyers would have changed their purchase decision if Sears had disclosed the then-known low probability that a mold-mildew problem might develop in an Access or Horizon washer.

The publicly available information concerning the potential for mold or mildew growth in front-loading washers also undermines any plausible inference of class-wide reliance on Sears' alleged omission.  For example, Plaintiffs specifically plead that some unidentified HE washer owners have posted their mold-mildew complaints on the Internet over the years (Compl. ¶ 34), that Sears provided information to consumers on the steps they can take to mitigate the risk of mold-mildew developing in the machines (*id.* ¶¶ 58, 72), and that Sears service technicians visited some of Plaintiffs' homes and discussed the problem (*id.* ¶¶ 49, 54, 62, 66, 77, 83).  In addition, several of the HE washer owner's manuals on which Plaintiffs base their express-warranty claims (*id.* ¶¶ 22-23) contain explicit statements regarding washer odor and preventive maintenance steps that owners should take to keep their washing machines smelling fresher and cleaner (*see* note 19, *supra*).  Accordingly, it would be unreasonable to assume that all or most of the putative class members had no knowledge of the risk of developing noticeable mold-mildew, or to assume that these consumers did not engage in any pre-sale or point-of-sale

---

[21] Importantly, the average historical risks are constantly changing over time, as is Sears' alleged "knowledge" of these risks.  That is, by definition, these risks are the cumulative seven-year complaint rate and three-year complaint rate for Kenmore Access and Kenmore Horizon washers, respectively. Plaintiffs essentially are asking this Court to force Sears to insure its HE washer customers against all future risks of product failure, whether known or unknown at the time of sale of the product.

communications with Sears or third parties regarding such risk, or to assume that all such communications resulted in uniform representations to each putative class member.

The district court's decision in *Hamilton v. O'Connor Chevrolet, Inc.*, is instructive here. *See* 2006 WL 1697171.  There, the plaintiffs sought class certification alleging, among other things, that the defendant car dealer was required, under the Illinois Fraud Act, to return a down payment to any potential automobile buyer if the buyer's credit application was rejected.  *Id.* at *8.  The court denied class certification, finding that even if the plaintiffs' legal theory was correct, they still would have to show that the dealer's failure to return the down payment to any particular class member was the proximate cause of that class member's damages:

> [S]ubstantial Illinois Supreme Court precedent teaches that actual damages and proximate cause must be shown to establish liability.  So, for example, if a putative customer returns to the car dealer, is told that his or her original financing application has been rejected, and is asked whether he or she would like to finance at a marginally higher rate, there is no violation of the ICFA if the customer elects to complete the transaction and would have done so irrespective of whether the car dealer went through the formality of actually handing the customer a check representing the proceeds of the down payment . . . .  Likewise, even if the customer was not told of his or her option to get back the down payment, and the customer refinanced the transaction at a marginally higher rate, the customer still would need to show both proximate cause and actual damages in a plaintiff-specific manner—for example, by analyzing whether the customer would have elected to unwind the transaction and/or would have shopped for and actually been able to obtain more advantageous financing in the market than the rate actually financed.

*Id.*  Numerous other courts have denied class certification where individual issues of proof of proximate cause and reliance would predominate.[22]

---

[22] *E.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008) ("Individualized proof is needed to overcome the possibility that a member of the purported class purchased Lights for some reason other than the belief that Lights were a healthier alternative–for example, if a Lights smoker was unaware of that representation, preferred the taste of Lights, or chose Lights as an expression of personal style."); *Clark v. Experian Info. Solutions, Inc.*, 256 Fed. Appx. 818, 861 (7th Cir. 2007) (in a case alleging deception under the Illinois Fraud Act, it is not possible for a plaintiff to establish proximate causation unless the plaintiff can show that he or she was, in some manner, deceived by the misrepresentation and satisfaction of this element requires individualized proof); *Williams*, 192 F.R.D. at 585 (refusing to certify an Illinois Fraud Act claim due to individual causation issues); *Oshana*, 225 F.R.D. at 582 ("To prove these claims, Oshana must establish a causal connection between the alleged misconduct and damages, namely that deceptive marketing induced each class member to purchase fountain diet Coke.  This is impossible to prove on a classwide basis . . . ." (citation omitted)).

### 2. The elements of Plaintiffs' express-warranty and implied-warranty claims will necessitate individual inquiries

The liability elements of Plaintiffs' claims for breach of express warranty and breach of implied warranty of merchantability raise many individual questions. First, if this case were to proceed to trial as a class action, Sears would have to explore whether each class member experienced one of Plaintiffs' alleged malfunctions and whether such malfunctions, if any, were caused by a common defect that existed when Sears sold the HE washer to that particular class member. *See Walsh*, 130 F.R.D. at 269 ("In order to show that issues of fact are common to the proposed class litigation under Rule 23, the plaintiffs must show that the substance of the evidence is substantially the same for all class members. . . . [T]hey must present credible classwide proof that the [product] in question suffered from some <u>common defect</u> causing" the particular malfunction alleged (citations omitted and emphasis added)). However, "[p]roving a class-wide defect where the majority of class members have not experienced any problems with the alleged defective product, if possible at all, would be extremely difficult." *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 455 (D.N.J. 1998). Even if Plaintiffs could establish the existence of a common defect, the existence of such defect alone would not establish class-wide injury. *See id.* ("Even where the alleged defect has manifested itself, individual issues of actual cause must be adjudicated."). That is because any given mold-mildew problem may have been caused by a variety of factors unrelated to any product defect. In particular, there are several intermediate causes of noticeable mold-mildew in washers, including the failure to use the proper laundry detergent, use of too much detergent causing "over-sudsing," and failure to take appropriate preventative measures, such as leaving the washer door open between uses, running an occasional "Clean Washer" or hot-water wash cycle with bleach and without clothing, and failure to clean the washer in accordance with the manufacturer's instructions. (Ex. 2 ¶¶ 18-19.) Thus, Sears would need to conduct a class member-by-class member inquiry to determine whether any alleged mold-mildew or odor was caused by the alleged design defect or, instead, by other, non-actionable factors. *Cf. Canon Cameras*, 237 F.R.D. at 360 (observing that the alleged "malfunctions may have been caused by any of a variety of factors—many of which, such as customer misuse of the camera, would not result in manufacturer liability under any theory—and that determination of the actual cause of a particular malfunction would require highly individualized fact-finding").

The need for such individualized inquiry is shown on the face of the Complaint. Plaintiffs' individual allegations differ widely as to the particular model and model-year machine they bought (*e.g.*, HE2, HE2t (which includes a Sanitary Cycle), HE3, HE3t (which includes a Sanitary Cycle), HE4t (same), HE5t (same), or HE5t Steam (which includes both a Sanitary Cycle and a steam feature) (Compl. ¶¶ 6-13; Ex. 2 ¶¶ 4-7, 11); the type, number, and cost of service calls, if any, required to correct the problems (Compl. ¶¶ 47-83); and whether the washer was covered by any warranty or service contract at the time of service (*id.*).  Thus, the Court would need to conduct individualized inquiries to determine the nature and cause of every putative class member's alleged malfunction and damages.

Second, whether the washer, because of the alleged defect, is "not fit for its ordinary purpose" of washing clothing—the very essence of an implied-warranty claim—can be determined only on an individual basis.  This issue was discussed at some length in *Osborne v. Subaru of America, Inc.*, 243 Cal. Rptr. 815 (Cal. Ct. App. 1988):

> [W]hether the cars are fit for their ordinary purpose will necessarily vary from vehicle to vehicle.  One plaintiff testified in deposition that she purchased her car in December 1972 when it was new.  She drove it approximately 50,000 miles within the first two years before she had to replace the head gaskets.  She had to replace the engine block at 110,000 miles.  These were the major mechanical repairs for which she sought damages.  Other plaintiffs allegedly suffered damages at lower elapsed mileages.  <u>The point derived from this panoply of defect-manifestation scenarios is that determining whether the Subarus failed to live up to the implied warranty of merchantability would require proof of the history of each vehicle and its problems</u>.

*Id.* at 822-23 (affirming denial of class certification) (emphasis added).[23]  Here, each class member would need to establish that his or her HE washer no longer cleans clothing satisfactorily and that any mold-mildew problem cannot be corrected using the various available remedies.  This cannot be accomplished on a class-wide basis, especially where the vast majority of owners have not experienced any problem at all.

---

[23] *See also Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 603 (S.D.N.Y. 1982) ("The majority of the tires sold to putative class members, by doing what they were supposed to do for as long as they were supposed to do it, clearly lived up to that 'minimum level of quality' which is all U.C.C. § 2-314(2)(c) requires.  Thus no claim for breach of an implied warranty is maintainable in respect of such tires. . . .  Since it appears that the majority of the putative class members have no legally recognizable claim, the action necessarily metastasizes into millions of individual claims.  That metastasis is fatal to a showing of predominance of common questions.").

Third, before being permitted to proceed on a claim for breach of either express warranty or implied warranty of merchantability, each class member would be required to prove that he or she provided Sears with pre-suit notice of the alleged breach of warranty.  (*See, e.g.*, Ex. 12 at 7 (striking class allegations in part because "[t]he element of pre-suit notice . . . depends on facts individual to each owner").)  Although the notice requirement is uniform among the states, different standards have evolved as to what specific type of notice is required.  (*See* Ex. 13 § III.B.)  Thus, it would be necessary to conduct a buyer-by-buyer inquiry to determine whether each class member provided the specific form of notice required under state substantive law.

Finally, for those states that require contractual privity to maintain breach of warranty claims, the facts relevant to establish whether each putative class member has a buyer-seller relationship or contractual privity with Sears will vary by each plaintiff.  (*Id.* § III.A.)

### 3.    Plaintiffs' unjust enrichment claims require individual inquiries

To establish a claim for unjust enrichment under the laws of Arizona, Colorado, Florida, Ohio, Oklahoma, Pennsylvania, and Wisconsin, Plaintiffs and the putative class members generally would need to plead and prove that (1) the owner conferred a benefit on Sears, (2) Sears knew of and retained the benefit, and (3) the retention of such benefit would be inequitable or unjust.  (*Id.* § IV.)  All three of these essential elements are too individualized to be proven on a class-wide basis.  For example, if an individual class member received the full benefit of his or her bargain and never experienced any mold-mildew problem—like 98.16% of the Kenmore Access buyers and 99.50% of the Kenmore Horizon buyers—that class member would not be able to show that Sears' retention of the washer's purchase price would be unjust.  *See, e.g.*, *Canon Cameras*, 237 F.R.D. at 360 ("A plaintiff who purchases a digital camera that never malfunctions over its ordinary period of use cannot be said to have received less than what he bargained for when he made the purchase.").  Moreover, because Plaintiffs' claims for unjust enrichment are based on Sears' fraudulent conduct, each buyer would need to prove reliance on a Sears' misrepresentation or omission in deciding to buy the HE washer and thereby conferring a benefit on Sears.  For the same reasons that class adjudication is inappropriate for Plaintiffs' consumer fraud claims (*see* Argument, Part IV.B.1, *supra*), class adjudication is inappropriate for the unjust enrichment claims.

The district court's decision in *Oshana* is instructive here.  There, the court denied certification of the plaintiff's unjust enrichment claims because individual issues of reliance and

damages would predominate: "In her complaint, Oshana alleges class members were 'tricked' by Coca-Cola's marketing scheme into purchasing fountain diet Coke that they would not have otherwise purchased.  Individualized issues of detriment and whether each member was tricked would predominate over any common issues of law or fact."  *Oshana*, 225 F.R.D. at 586 (internal citation omitted).  Likewise, a number of other courts have concluded that similar unjust enrichment claims are inappropriate for class certification because of the need for individualized proof.[24]

### C.    The Predominance of Individual Questions of Fact and Law Renders Plaintiffs' Proposed Class Action Unmanageable and Inferior

The second prong of Rule 23(b)(3) requires that a class action be a superior and manageable vehicle for adjudication.  Fed. R. Civ. P. 23(b)(3); *Bridgestone/Firestone*, 288 F.3d at 1018-20.  Here, a class action is inferior for at least two reasons.

First, proof of the liability and damages elements of Plaintiffs' claims will require individual fact determinations for each putative class member.  Proof of the existence of a defect that proximately caused a product malfunction and damages will require individual fact determinations for each of the asserted claims.  Moreover, the warranty claims will require individual fact determinations concerning whether there is a buyer-seller relationship between

---

[24] *E.g.*, *Sears Tools Mktg.*, 2007 WL 4287511, at *9 (finding that "the bulk of the proof [for an unjust enrichment claim] will relate to individual factual issues"); *Canon Cameras*, 237 F.R.D. at 359-60 (denying certification because the majority of putative class members could not prove damages element essential to their unjust enrichment claims); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 213-14 (D. Minn. 2003) (finding that individual issues predominate as to whether class members were injured by the product or the product did not provide any health benefits); *Krieger v. Gast*, 197 F.R.D. 310, 320 (W.D. Mich. 2000) (refusing to certify unjust enrichment claim because "the fraud-related claims predominate[d]" and those claims would "likely provide the sole basis of liability on the unjust enrichment claim"); *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 183 F.R.D. 217, 222 (W.D. Mich. 1998) ("[I]t appears from plaintiffs' own survey of state laws on unjust enrichment and constructive trust relief that a showing of fraud or other inequitable conduct is universally prerequisite to the imposition of a constructive trust.  Inasmuch as Jackson National's alleged fraud is the inequitable conduct at issue in this case, and a showing of reliance is essential to establishment of fraud, it is fair to say that a showing of reliance is prerequisite to relief in the form of a constructive trust as well."); *Osuna v. Wal-Mart Stores, Inc.*, No. C20014319, 2004 WL 3255430, at *6 (Ariz. Super. Ct. Dec. 23, 2004) (denying certification of unjust enrichment claim because of necessity for individual inquiry to establish liability and damages); *Green v. McNeil Nutritionals, LLC*, No. 2004-0379-CA, 2005 WL 3388158, at *5 (Fla. Cir. Ct. Nov. 16, 2005) ("Logically, the circumstances necessary to establish the [unjust] element . . . must demonstrate that the plaintiff was harmed in some way before courts will impose this equitable remedy.  Therefore, . . . sustaining a cause of action for unjust enrichment requires individualized proof from each member of the class.").

the class member and Sears (or, instead, the class member is a second-hand buyer), what express or implied warranties (if any) run from Sears to that buyer, and whether each class member provided the statutorily required pre-suit notice of breach and an opportunity for Sears to cure the defect.  All of these individual questions of fact would overwhelm any benefit that might be derived from class action treatment of this case.

Second, Plaintiffs' lawsuit will require application of the laws of 51 jurisdictions for the MMWA written-warranty claim and the laws of seven states for the remaining claims.  The application of many states' substantive laws in one class action, however, is not a superior method of adjudication and renders Plaintiffs' proposed class action unmanageable and inferior.  *See Sears Tools Mktg.*, 2007 WL 4287511, at *10 (the differences in 51 jurisdictions' unjust enrichment and seven states' consumer fraud laws was "another factor that renders the proposed class action unmanageable").[25]  Further, a federal court cannot amalgamate state laws into "a kind of Esperanto instruction" to the jury.  *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995).

To the extent that a small fraction of HE washer buyers are unhappy with their washers, such disputes will require the application of a different set of laws for class members from different states, as well as different laws governing the various claims within each interested state.  Moreover, proof of reliance, damages, and other elements and affirmative defenses will require individual proof for each of the asserted claims.  This task would overwhelm any benefit that might be derived from class action status.  *Cf. Bridgestone/Firestone*, 288 F.3d at 1018 (individual fact and legal issues precluded certification of nationwide <u>or</u> statewide classes).

## V.    PLAINTIFFS' PROPOSED INJUNCTIVE-RELIEF CLASSES DO NOT SATISFY THE REQUIREMENTS OF RULE 23(B)(2)

### A.    Rule 23(b)(2) Certification Is Not Appropriate Where, as Here, Plaintiffs Seek Predominantly Monetary Relief

Plaintiffs cannot obtain a Rule 23(b)(2) certification of a nationwide class, or the seven proposed subclasses, because the allegations in the Complaint reveal that they seek predominately monetary relief.  Class certification is appropriate under Rule 23(b)(2) only if the

---

[25] *See also Oshana*, 225 F.R.D. at 587 ("A class action is not a superior method of adjudication when 'extensive individualized proceedings to determine causation, damages and reliance' are unavoidable."); *Lilly*, 2002 WL 507126, at *2 (denying certification on superiority grounds); *Fisher*, 181 F.R.D. at 373 (same).

defendant "has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Fed. R. Civ. P. 23(b)(2). Declaratory or injunctive relief must be the primary remedy requested, assessed by the type of relief that the plaintiffs actually seek. *Clay*, 188 F.R.D. at 494. A class action may be maintained under Rule 23(b)(2) only if money damages are incidental to the equitable relief. *In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005).

Federal courts ignore the named plaintiffs' superficial labels and analyze the nature of the relief actually requested in the complaint to determine whether declaratory or injunctive relief is the primary remedy requested. In *Clay v. American Tobacco Co.*, for example, the plaintiffs sought certification under Rule 23(b)(2), claiming that the defendants engaged in selling or causing the sale of cigarettes to minors. 188 F.R.D. at 494. Although the defendant's alleged course of conduct (uniform marketing strategy) met the "general applicability" requirement of Rule 23(b)(2), the court nonetheless ruled that the action could not be certified under Rule 23(b)(2), stating: "This case is, without a doubt, all about money." *Id*. The court noted that the plaintiffs' request for disgorgement of millions of dollars in profits, coupled with the request for punitive damages and other monetary references within their prayer for relief, dictated that certification under Rule 23(b)(2) was inappropriate. *Id.* at 494-95. Similarly, other courts have denied certification under Rule 23(b)(2) where the declaratory relief requested was a determination that the defendant owes money damages and an injunction requiring payment. *See Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 530-31 (D.C. Cir. 2006) (Rule 23(b)(2) certification properly denied where the plaintiff sought a declaratory judgment that the defendant was liable and an injunction requiring the defendant to pay each class member money to compensate them for lost or damaged luggage).

Here, Plaintiffs' case is all about money. Any argument that certification is appropriate under Rule 23(b)(2) is belied by the numerous references to and requests for money. (Compl. ¶¶ 97, 106, 114, 123, 132, 140, 148, 159, 163, 173, 184, 195, 206, 217, 228, 239, 250, 265, 304, 309, 314, 319, 324, 329, 334, 339, 344; *id.* at pp. 71-72 (Prayer for Relief).)

### B. Rule 23(b)(2) Certification Is Not Appropriate Where, as Here, Individual Questions of Fact Predominate

Plaintiffs cannot establish any injunctive-relief class for the separate and independent reason that individual fact issues predominate over any issues that might be common to the classes. The "general applicability" prong of Rule 23(b)(2) provides that the party opposing the

class "must have acted in a consistent manner toward members of the class so that [its] actions may be viewed as part of a pattern of activity." *Clay*, 188 F.R.D. at 494 (internal quotations omitted). Courts recognize that "Rule 23(b)(2) includes an implicit 'cohesiveness' requirement, which precludes certification when individual issues abound." *See Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 557 (D. Minn. 1999) (denying Rule 23(b)(2) certification). Thus, for the reasons discussed in Part IV above, the predominance of individual fact issues precludes certification of a Rule 23(b)(2) class here.

### C.    Rule 23(b)(2) Certification Is Not Appropriate Where, as Here, Individual Questions of Law Predominate

The "general applicability" prong presents yet another obstacle to certification of the nationwide injunctive-relief class: the legal rights of the putative class members derive from the laws of all 50 states and the District of Columbia because injunctive relief must be founded on some underlying legal violation. *See In re Paxil Litig.*, 212 F.R.D. 539, 552 (C.D. Cal. 2003). As discussed above, under Illinois choice-of-law rules, the law of the state of purchase will apply to the rights of the individual HE washer owners. With more than 2,500,000 HE washers sold during the putative class period (Ex. 1 ¶ 6 & Tables 1-2), it is a certainty that the laws of all 50 states and the District of Columbia would need to be analyzed to determine if there was an underlying legal violation that would support injunctive relief. *See Paxil Litig.*, 212 F.R.D. at 552. Due to variations among the underlying state laws, courts routinely deny certification of injunctive-relief classes under Rule 23(b)(2). *E.g.*, *id*. at 551-52; *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 74-75 (S.D.N.Y. 2002) (denying certification of medical-monitoring class because "the Court would be obliged to apply the laws of each of the fifty states to the claims of members of the putative subclass").

### CONCLUSION

Pursuant to Rules 12(f), 23(c)(1), and 23(d)(1)(D), the Court should strike Plaintiffs' class allegations to prevent wasteful class discovery and class-certification proceedings.

Dated:  August 11, 2008                    Respectfully submitted,


                                           s/ Michael T. Williams
                                           Michael T. Williams

                                           Michael T. Williams
                                           Galen D. Bellamy
                                           Kara J. Rosenthal
                                           Evan Stephenson
                                           Wheeler Trigg Kennedy LLP
                                           1801 California Street, Suite 3600
                                           Denver, CO  80202-2617
                                           Telephone: (303) 244-1800
                                           Facsimile:  (303) 244-1879

                                           and

                                           Bradley B. Falkof
                                           Brad E. Rago
                                           Barnes & Thornburg LLP
                                           1 North Wacker Drive, Suite 4400
                                           Chicago, IL  60606
                                           Telephone: (312) 214-8304
                                           Facsimile:  (312) 759-5646

                                           Attorneys for Sears, Roebuck and Co.

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that a copy of the foregoing Memorandum in Support

of Defendant's Motion to Strike Class Allegations from the Consolidated Class Action

Complaint was served on the following via the Court's CM/ECF system on this 11th day of

August 2008:

Joseph Patrick Shea
Law Offices of Joseph Patrick Shea
2400 N. Western Avenue, Suite 205
Chicago, Illinois 60647
Telephone: 773-365-0040
Facsimile: 773-772-2421

James E. Miller
Patrick A. Klingman
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: 860-526-1100
Facsimile: 860-526-1120
jmiller@sfmslaw.com
pklingman@sfmslaw.com

James C. Shah
Natalie Finkelman Bennett
Nathan Zipperian
Shepherd Finkelman Miller & Shah, LLP
35 East State Street
Media, PA 19063
Telephone: 610-891-9880
Facsimile: 610-891-9883
jshaf@sfmslaw.com
nfinkelman@sfmslaw.com
nzipperian@sfmslaw.com

Karen M. Leser-Grenon
Shepherd Finkelman Miller & Shah, LLP
401 West A Street, Suite 2350
San Diego, CA 92101
Telephone: 619-235-2416
Facsimile: 619-234-7334
kleser@sfmslaw.com

Ronald S. Kravitz
Matthew Borden
Liner Yankelvitz Sunshine & Regenstreif LLP
199 Fremont Street, 20th Floor
San Francisco, CA 94105-2255
Telephone: 415-489-7700
Facsimile: 415-489-7701
rkravitz@linerlaw.com
mborden@linerlaw.com


_____ s/ Michael T. Williams_____